JONES v. UNITED STATES.†

(Circuit Court of Appeals, Ninth Circuit. May 16, 1910.)

No. 1,731.

1. CRIMINAL LAW (§ 284*)—PLEA IN ABATEMENT—TRIAL.

Where a plea in abatement in a criminal case was submitted to the court and overruled, being determined as a question of law, it was not error, when it subsequently appeared that a question of fact was involved, to submit such question to a jury.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 655; Dec. Dig. § 284.*]

2. CRIMINAL LAW (§ 1035*)—APPEAL AND ERROR—NECESSITY OF OBJECTIONS IN LOWER COURT.

The objection that an issue of fact raised by a plea in abatement in a criminal case was submitted to the jury which tried the case on the merits cannot be made for the first time in the appellate court, since there can be no reviewable error in relation to a question which was not presented to nor ruled upon by the trial court, unless the error was plain and absolutely vital to the defendants' case.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2643; Dec. Dig. § 1035.*]

3. CONSPIRACY (§ 43*)—INDICTMENT—VARIANCE—DESIGNATING KNOWN CONSPIRATOR AS UNKNOWN.

There is not a fatal variance between indictment and proof in a prosecution for conspiracy under Rev. St. § 5440 (U. S. Comp. St. 1901, p. 3676), because the indictment charges that defendants conspired with each other and with others to the grand jurors unknown, while the evidence shows that the name of another conspirator was in fact known, where the indictment fully sets out his connection with the conspiracy, and designates him by name, so as to clearly advise defendants of the charge against them.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 90; Dec. Dig. § 43.*]

4. CONSPIRACY (§ 45*)—TRIAL—EVIDENCE.

Evidence considered in a prosecution for conspiracy, and held to have a sufficient tendency to show the connection of other defendants with the conspiracy, to render letters written by them, charged in the indictment as overt acts, admissible in evidence against the defendants on trial.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 102; Dec. Dig. § 45.*]

5. CONSPIRACY (§ 47*)—TRIAL—SUFFICIENCY OF EVIDENCE.

In a prosecution under Rev. St. § 5440 (U. S. Comp. St. 1901, p. 3676), for a conspiracy to defraud the United States, the government is not required to prove that all the overt acts alleged were committed, nor that all the defendants named in the indictment were engaged in the conspiracy, and, in such a prosecution, the fact that there was evidence tending to show that the conspiracy in which some of the defendants not on trial were engaged was separate from that in which those on trial were engaged did not entitle the latter to an acquittal.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 105–107; Dec. Dig. § 47.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied October 3, 1910.

6. CRIMINAL LAW (§ 368*)—EVIDENCE—DECLARATIONS OF CO-CONSPIRATOR.

Declarations made by one conspirator while the conspiracy was in progress, and relating to its object, although not in furtherance thereof, are admissible as part of the res gestæ against each conspirator.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 812, 815; Dec. Dig. § 368.*]

7. CRIMINAL LAW (§ 369*)—EVIDENCE—COMPETENCY.

Where evidence is competent and relevant in a criminal case as tending to establish the guilt of defendant of the crime charged, it is not rendered incompetent because it may also tend to establish another offense or a breach of trust on his part.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 822, 823; Dec. Dig. § 369.*]

8. WITNESSES (§ 372*)—IMPEACHMENT—BIAS—CROSS-EXAMINATION—EVIDENCE OF OTHER OFFENSES—MOTION TO STRIKE OUT.

Where, on cross-examination of a witness for the prosecution in a criminal case, it was sought to discredit his testimony by showing his hostility to defendant, the fact that his answers, admitting and explaining such hostility tended to show that defendant had committed other illegal acts did not entitle defendant to have them stricken out.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1192, 1193; Dec. Dig. § 372.*]

9. CRIMINAL LAW (§ 423*)—EVIDENCE—CONSPIRACY.

In a prosecution for conspiracy to defraud the United States of public lands by fraudulently acquiring state lands, and having them included within a national forest reservation, thus acquiring the right to select in exchange public lands of the United States of greater value, where one of the defendants was at the time of the transactions Commissioner of the General Land Office, evidence that the reservation was established on his recommendation, that news of the fact was given out in advance of the official anouncement, and that his resignation was afterward requested by his superiors because of his conduct in relation to forest reservations was competent on the trial of a codefendant.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 989; Dec. Dig. § 423.*]

10. CRIMINAL LAW (§ 1169*)—REVIEW ON ERROR—HARMLESS ERROR—ADMISSION OF EVIDENCE.

Testimony admitted on the trial of an indictment for conspiracy *held* competent and material, and its admission, even if erroneous, not prejudicial to defendant.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3137; Dec. Dig. § 1169.*]

11. CRIMINAL LAW (§ 371*)—EVIDENCE—ACTS PART OF A SERIES SHOWING DESIGN—CONSPIRACY.

On the prosecution of defendant for conspiracy to defraud the United States of public lands by fraudulently acquiring state lands of little or no value, procuring their inclusion in a national forest reservation, and obtaining lieu lands of greater value from the government in exchange therefor, evidence of such fraudulent acquiring of state lands within the boundaries of the reservation subsequently established more than three years before the finding of the indictment, and the sale of which by the state had afterward been validated by an act of the Legislature, was nevertheless admissible as tending to prove the intent and design of the conspiracy.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 830–832; Dec. Dig. § 371.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

12. CRIMINAL LAW (§ 150*)—LIMITATION—CONSPIRACY.
    Where an alleged conspiracy to defraud the United States contemplated various overt acts, and the consequent continuance of the conspiracy beyond the commission of the first one, each overt act gives a new, separate, and distinct effect to the conspiracy, and constitutes another crime, and a prosecution is not barred until three years after the last overt act averred in the indictment.

    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 274, 275; Dec. Dig. § 150.*

    Commencement of period of limitations against prosecutions for continuing offenses, see note to Ware v. United States, 84 C. C. A. 519.]

13. CRIMINAL LAW (§ 371*)—EVIDENCE—SIMILAR ACTS SHOWING DESIGN.
    On the trial of a defendant for conspiracy to defraud the United States of public lands, evidence that he had previously been engaged in the illegal acquisition of public lands elsewhere by a different method was admissible as bearing upon the questions of intent, purpose, and design.

    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 830, 832; Dec. Dig. § 371.*]

In Error to the Circuit Court of the United States for the District of Oregon.

Willard N. Jones was convicted of a criminal offense, and he brings error. Affirmed.

S. B. Huston and Martin L. Pipes, for plaintiff in error.

Tracy C. Becker and Francis J. Heney, U. S. Sp. Asst. Atty. Gens.

Before GILBERT and MORROW, Circuit Judges, and FARRINGTON, District Judge.

MORROW, Circuit Judge. The plaintiff in error was charged by indictment in the Circuit Court for the District of Oregon with John H. Mitchell, Binger Hermann, John N. Williamson, Franklin P. Mays, and George Sorenson with the crime of conspiracy, alleged to have been entered into on the 15th day of February, 1902, between the parties named, "and with divers other persons to the said grand jurors unknown," to defraud the United States out of the possession and use of and title to divers large tracts of the public lands of the United States of great value, to wit, 200,000 acres of the public lands of the United States, lying in divers states and territories of the United States, of the value of $3,000,000. The indictment is framed under section 5440 of the Revised Statutes (page 3676, U. S. Comp. St. 1901) and contains but a single count. It is charged, in substance, that the conspirators named, in pursuance and by means of a fraudulent plan, were to obtain fraudulently from the state of Oregon title to and possession of a large quantity, to wit, 150,000 acres of school lands, lying within the counties of Crook, Grant, Harney, Malheur, Baker, Union, Umatilla, and Wallowa in the state of Oregon, still vacant by reason of the land being arid and worthless, and open to purchase from the state by residents thereof under the laws of the state of Oregon at $1.25 per acre, in quantity not exceeding 320 acres for each resident, upon application made to the proper authorities of the state of Oregon by a resident, supported by his affidavit showing his qualifications to make such purchase, and, amongst other things, his in-

tention to purchase such lands in good faith and for his own benefit, and that he had made no contract to sell the same; that said school lands were to be obtained from the state by making and filing with the state authorities applications for the purchase of the same, and assignments of the same, and of the certificates of purchase thereof in the names of persons not really desiring and legally qualified to purchase such lands. It is charged that the defendants would procure the use of the names of such persons for the purposes named by paying them respectively small sums of money; that the defendants would support such applications with fraudulent affidavits, known to the defendants to be false, in this, that they would purport to be the bona fide affidavits of the persons whose names were signed thereto, whereas in truth and in fact they would not be the bona fide affidavits of the persons whose names were signed thereto, because such affidavits would state that the affiants therein were persons qualified under the laws of the state of Oregon to make such applications and to purchase such lands, by reason, amongst other things, of their intending to purchase the same in good faith and for their own benefit respectively, and of their having no contract or agreement to sell the same, while in truth and in fact none of such persons were intending to purchase such lands in good faith for his own benefit or at all, but would be knowingly aiding and assisting the defendants in their fraudulent plan. It was further charged that the defendants, through the influence of said John H. Mitchell, who was then a Senator of the United States of and for the state of Oregon, and the said Binger Hermann, who was then the Commissioner of the General Land Office of the United States, to induce and procure the establishment of a forest reserve in the counties named, under the laws of the United States, which would include within its limits the school lands so to be fraudulently obtained from the state; and also a large quantity, to wit, 30,000 acres of such other school lands, lying in said counties which had theretofore been fraudulently obtained by the defendants from the state of Oregon by the same fraudulent means; and also a large quantity, to wit, 20,000 acres of poor timber lands, lying in the said county of Crook, which were to be fraudulently obtained by the defendant Williamson from the United States through purchases from the United States under the laws pertaining to the sale of timber lands, to be made, by his procurement, by persons who would be acting as his agents, and who would not be in good faith purchasing the same for their own use and benefit. It was further charged that the defendants would cause to be relinquished, assigned, and transferred to the United States the titles to and possession of such timber lands and school lands so fraudulently obtained and to be obtained from the United States and from the state of Oregon in exchange for public lands to be selected, and for titles thereto by patent to be obtained under the laws of the United States by and on behalf of the defendants from among the public lands of the United States open to such selection, lying outside of the limits of the forest reserve, so to be established in lieu of such timber and school lands so to be made to lie within the limits of such forest reserve. It is further charged that

the defendants, when so causing to be relinquished, assigned and transferred to the United States the titles to and exchanging the timber and school lands to be so fraudulently obtained from the United States and from the state of Oregon, for public lands of the United States, and for titles by patent thereto, well knowing such titles to timber and school lands to be as they would be, false, fraudulent, and worthless, and the possession acquired thereunder unlawful, and intending thereby and by afterwards selling and disposing of such public lands and patent titles to the general public and to persons having no knowledge of the fraud involved in the obtaining of the same from the United States, to defraud the United States out of the possession and use of and title to the public lands so to be selected, obtained and appropriated in lieu of such school lands, to the profit, gain, use, and benefit of themselves and prejudice of the administration of the public laws of the United States, and contrary to the true intent and policy thereof. The indictment then proceeds to charge certain overt acts alleged to have been committed by individual defendants in pursuance of the conspiracy and to effect its object.

1. It is charged that the defendant John H. Mitchell on February 22, 1902, at Washington, signed a letter addressed to Binger Hermann, Commissioner of the General Land Office, in which the writer said:

"On January 21, 1902, I wrote a letter to Hon. E. A. Hitchcock, Secretary of the Interior, forwarding petitions numerously signed, praying for the establishment of a forest reserve in Oregon to include all of the lands embraced in the following named contiguous localities, being parts of Grant, Malheur, and Harney Counties, state of Oregon, to wit: The entire watershed known as 'Strawberry Mountain'; the headwaters of the north and middle forks of the Malheur river and their tributaries; Silvies river and tributaries; Silver creek and tributaries; the south fork of the John Day river, and its tributaries. I subsequently received a letter from the Secretary saying he had transmitted the same to your office. I desire to know whether they have been received at your office, and what action, if any, has been taken. I earnestly urge early consideration of this matter."

2. It was further charged as an overt act that Binger Hermann on March 11, 1902, signed a letter addressed to S. B. Ormsby, Forest Superintendent, Salem, Or., in which the writer said:

"I inclose herewith copies of a letter from Hon. J. H. Mitchell, U. S. Senate, and petitions numerously signed by residents of Malheur and Harney counties, Oregon, praying for the early establishment of a forest reserve, in Oregon, to cover a continuous area in Grant, Malheur and Harney counties, designated as follows: [Then follows the description of the lands as in Senator Mitchell's letter.] I also inclose copy of a letter from Hon. Geo. W. McBride, dated at Portland, Oregon, July 29, 1900, protesting against the inclusion at any time within any reserve of townships 13 South, ranges 32, 33, 34, and 35 East, W. M., Oregon, and copy of similar protest presented by the Hon. Joseph Simon with his letters of July 30, 1900, dated at Portland, Oregon. It is desired that you make thorough examination and report in this matter at the earliest practicable date, with a view to determining as to the advisability of reserving the designated area, as requested by petitioners. Also report regarding present owners and settlers. Particular attention should be given, in your examination, to the advisable boundaries of the proposed reserve, and you are directed to make your report specific in this respect. You will give careful consideration to said protests if it be found that the four townships described therein are within the general area desired to be reserved. Advise

this office what is the earliest practicable date, in view of the other duties incumbent upon you, at which report in this matter may be made."

3. It was further charged as an overt act that the defendant Franklin P. Mays, during the month of March, in the year 1902, unlawfully conveyed and transferred to Salmon B. Ormsby, Forest Superintendent of the United States, detailed to investigate and report to the said Binger Hermann, commissioner as aforesaid, concerning the advisability of creating the forest reserve, and the limits thereof, two sections of the school lands which had so been fraudulently obtained from the state of Oregon, and this to induce the said Ormsby to make a report in favor of establishing the said forest reserve in the state of Oregon in such manner as to include within its limits the several kinds of lands so fraudulently obtained and to be obtained from the United States and from the state of Oregon by the defendants.

4. It is further charged as an overt act that Franklin P. Mays on the 15th day of July, in the year 1902, at the city of Portland, addressed a letter to Binger Hermann, at Washington, in which the writer said:

"I inclose clipping from to-day's Oregonian. The section therein referred to is immediately adjoining the proposed Strawberry Mountain Reserve, and emphasizes my previous recommendation of the great necessity for promptly making a temporary withdrawal of the land within the boundaries of the proposed reserve."

The newspaper clipping referred to in the letter contains a news item from Baker City, dated July 14th, headed:

"Timber Land Rush in Baker.
"Railroad Talk Causes Many to Take Up Claims."

The item recites:

"Timber lands in this section are being taken up rapidly. It is estimated that along the line of the proposed railroad into the counties of Malheur and Harney, 20,000 to 25,000 acres of land, well covered with timber, have been located since the 1st of March. Along this same proposed railroad there are numerous mining locations, both quartz and placer, that are only awaiting the advent of some means of cheap transportation so that the owners can proceed with their development. Some of the best prospects in Eastern Oregon are located in the heavily timbered country, or near it, and as lumber and ore will furnish freight for a railroad, there is every inducement to build the proposed line."

5. It is further charged as an overt act that the defendant John N. Williamson, on the 23d day of September, in the year 1902, addressed a letter to Binger Hermann at Washington. This letter recites at some length the reasons for the establishment of the proposed Blue Mountain Forest Reserve, and suggests a boundary for the proposed withdrawal in the southern part of Wallowa county. This letter also contained a newspaper clipping concerning matters relating to the land and the proposed reserve.

This indictment was presented and filed in court on the 13th day of February, 1905. The names of the witnesses who had appeared before the grand jury were indorsed upon the indictment, among others, the name of Salmon B. Ormsby, described in the indictment as a forest superintendent, to whom Binger Hermann addressed a letter

calling for an examination and report concerning the advisability of reserving the proposed area, and also the person to whom the defendant Mays conveyed two sections of school lands to induce the said Ormsby to make a report in favor of establishing the said forest reserve. Upon this indictment the defendant Jones was arraigned. On April 17, 1905, he filed a plea in abatement. The plea sets up, among other things, that George Giustin, impaneled and sworn as a member of the grand jury, and who had voted with the other grand jurors upon the filing of the indictment against the defendant, was not and never had been a citizen of the United States, and that Frank Bolter and Joseph Esner who were also impaneled and sworn as members of the grand jury, and who had acted with the other grand jurors in voting upon said indictment, were not taxpayers in the county in which they resided or in any county in the state of Oregon, nor was either of them upon the preceding assessment roll of any county in the state at the time they were impaneled as grand jurors, of which facts the defendant had no knowledge until after the filing of the indictment. A similar plea in abatement having been filed on behalf of the defendant Mitchell in another case, it was, on April 25, 1905, before Hon. Charles B. Bellinger, United States District Judge for the district of Oregon presiding in the Circuit Court, stipulated that the same objections which had been filed by the United States Attorney to the pleas in abatement in that case should be deemed and treated as filed in this case, and that the affidavit of Georgio Giustinianovich and a certified copy of the decree of the county court of the state of Oregon for Clatsop county be deemed and treated as offered in support of the objection to the plea in this case, and that the same proceedings, objections, exceptions, rulings, and decrees be deemed, considered, and treated as having occurred upon the hearing of the plea in abatement in this case. The court thereupon held that the plea challenging the qualifications of Bolter and Esner to serve as grand jurors was insufficient, and the same should be disallowed and dismissed, and that the plea alleging that Giustin was not a citizen of the United States should be tried by the court without a jury upon its merits, and the United States Attorney be permitted to file affidavits by himself and by Georgio Giustinianovich, and a certified copy of the decree of the county court of the state of Oregon for the county of Clatsop. The defendant was also permitted to file counter affidavits or produce oral testimony upon the issue raised by the plea; but this the defendant declined to do, on the ground that he was entitled to have the issue tried, if at all, by a jury. Thereupon the court found and decreed that said George Giustin was a citizen of the United States, and ordered and decreed that the plea in abatement denying his citizenship be disallowed. To this finding, order and decree the defendant objected and excepted. On July 28, 1906, before Hon. William H. Hunt, United States District Judge for the district of Montana presiding in the Circuit Court, the attorney for the United States moved for a severance of the defendants, and that the trial of the defendants Hermann and Williamson be continued for the term. The motion was granted. The defendant Jones thereupon demurred

to the indictment, and on August 20, 1906, the demurrer was over-ruled, and thereupon, upon motion of attorney for the United States, it was ordered that defendant's plea in abatement be tried by the jury to be impaneled for the trial of the cause upon its merits. To this order the defendant objected on the ground that the plea in abatement had already been tried and determined by the court, and that said decision had not been set aside or reversed. The objection as stated in the bill of exceptions is as follows:

"Whereupon counsel for defendants Willard N. Jones and George Sorenson each severally objected to the submission of said plea in abatement to said jury or the trial thereof by said jury or any jury."

The defendants Mays, Jones, and Sorenson being arraigned upon the indictment, pleaded not guilty. The trial of the charge of conspiracy as alleged in the indictment against these three defendants was then proceeded with, and on September 13, 1906, the jury returned a verdict of guilty against the three defendants. In submitting the case to the jury the court also submitted the issue raised by the defendant's plea in abatement. This the court did in the following language:

"Before proceeding to the consideration of the question of the guilt or innocence of the defendants under the indictment, I will remind you that there is an issue in the case raised as to the citizenship of George Giustin, who was a member of the grand jury, under the name of George Giustin, which preferred the indictment under which these defendants are on trial. The question is, was or was not George Giustin a citizen of the United States at the time he served as a grand juror? His naturalization papers show that he was admitted as a citizen at Astoria, Oregon, April 4, 1881, and that he received his papers as Georgio Giustinianovich which he says was his name in Austria, the country where he came from. He has testified that, for reasons of convenience, he dropped this name, and for many years in Portland has gone under the name of George Giustin. As the naturalization papers offered by him appear to be regular under the law, I charge you that if you are satisfied beyond a reasonable doubt that he is the same man who was naturalized as Georgio Giustinianovich. you should find upon this issue in favor of the United States."

Under this instruction the jury returned a verdict for the United States upon the issue of the citizenship of George Giustin, as follows:

"We, the jury in the above-entitled cause, find for the United States upon the issue of citizenship of George Giustin."

It is assigned as error that the court erred in submitting to the jury impaneled to try the cause defendant's plea in abatement, and in receiving proof by the United States upon the issue tendered by said plea; the said plea having theretofore by the court been overruled.

The objection to the two jurors concerning whom it was alleged in the plea in abatement that they were not taxpayers in the state of Oregon and not upon the preceding assessment roll of any county in the state appears to have been abandoned by the plaintiff in error as the question has not been preserved in the bill of exceptions or in the assignments of error. The remaining objection presented by the plea in abatement that George Giustin was not a citizen of the United States was first decided by Judge Bellinger adversely to the objection. When the case was reached for trial more than a year later by Judge Hunt of Montana, assigned to the district of Oregon to hold the Cir-

cuit Court, the attorney for the United States requested the court to submit this question to the jury together with the proof relating to the naturalization and citizenship of the juror. The objection was then made that this question should not be submitted to the jury to be impaneled to try the case or to any jury for the reason that the plea had already been overruled by the court. The court overruled this objection, and the question was submitted to the jury as a question of fact. We see no error in this proceeding as presented by the record before us. The question of the naturalization and citizenship of the juror appears to have been first presented to the court upon a certified copy of decree of court, and presumably was considered and determined by the court as a question of law. It subsequently appearing that there remained to be determined the question of fact involved in the identity of the name of the juror and the person naturalized, the question of fact was properly submitted to the jury for determination. The objection now urged that this question should have been submitted to another jury, and not to the jury impaneled to try the case should have been presented to the court below, and not the objection that it should not be submitted to that jury or to any jury. Had the matter been presented there as it has been here doubtless the issue would have been submitted by the court to another jury for determination; but as this was not done the objection as now made comes too late. Clark v. Fredericks, 105 U. S. 4, 5, 26 L. Ed. 938.

In an action at law this court is limited to the correction of the errors of the court below. Questions which were not presented to or decided by that court are not open for review here because the trial court cannot be guilty of error in a ruling that it has never made upon an issue to which its attention was never called. St. Louis S. W. Ry. Co. v. Henson, 58 Fed. 531, 532, 7 C. C. A. 349; Board of Com. of Lake County v. Sutliff, 97 Fed. 270, 275, 38 C. C. A. 167; Mayor of the City of Helena v. United States, 104 Fed. 113, 115, 43 C. C. A. 429; Lesser Cotton Co. v. St. Louis, I. M. & S. Ry. Co., 114 Fed. 133, 140, 52 C. C. A. 95; City of Pittsburgh v. Jonathan Clark & Sons Co., 154 Fed. 464, 467, 83 C. C. A. 262; Dahl v. Montana Copper Co., 132 U. S. 264, 267, 10 Sup. Ct. 97, 33 L. Ed. 325; Morrison v. Watson, 154 U. S. 111, 115, 14 Sup. Ct. 995, 38 L. Ed. 927; Trust Co. v. Hensey, 205 U. S. 298, 306, 27 Sup. Ct. 535, 51 L. Ed. 811. In Robinson & Co. v. Belt, 187 U. S. 41, 50, 23 Sup. Ct. 16, 19 (47 L. Ed. 65), the province of the appellate court is stated in the following language:

"While it is the duty of this court to review the action of subordinate courts, justice to those courts requires that their alleged errors should be called directly to their attention and that their action should not be reversed upon questions which the astuteness of counsel in this court has evolved from the record. It is not the province of this court to retry these cases de novo."

An exception to this limitation has been admitted in criminal cases where, if a plain error has been committed by the trial court absolutely vital to defendant's case, the court will feel itself at liberty to correct it, although not presented in the record by proper objections and exceptions. Wiborg v. United States, 163 U. S. 632, 658, 16 Sup. Ct. 1127, 1197, 41 L. Ed. 289; Clyatt v. United States, 197 U. S. 207,

221, 25 Sup. Ct. 429, 49 L. Ed. 726. But we do not find that it was a plain error vital to the defendant's case that the question of the citizenship of a grand juror who participated in finding the indictment should have been determined by a jury other than the one that tried the case upon its merits. The evidence of the naturalization and citizenship of the juror appears to have been full and complete, and no evidence was offered on the part of the defendant to the contrary. It was practically an admitted fact. The submission of the question of identity to the jury was therefore presumably out of abundant caution. We know of no reason why such a proceeding should be held to be error.

It is next contended that the allegation in the indictment that the defendants conspired "with divers other persons to the said grand jurors unknown" was a material averment, and that if it appeared that such other persons were known to the grand jury the court should have instructed the jury as requested to acquit the defendants. This alleged error is based upon the fact that one Salmon B. Ormsby, who was a witness before the grand jury that found the indictment, and who was also a witness on behalf of the United States upon the trial of the cause, in the course of his testimony stated facts and circumstances which it is conceded tended to show that he himself was a co-conspirator. The defendants offered to prove that he testified to the same facts before the grand jury that he did on the witness stand. Furthermore it was admitted by the attorney for the United States that Ormsby was a co-conspirator, and that his name had been left out of the indictment that he might be used as a witness upon the trial. The charge in the indictment is based upon section 5440 of the Revised Statutes which provided:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner, or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable," etc.

In Bannon and Mulkey v. United States, 156 U. S. 464, 468, 15 Sup. Ct. 467, 469 (39 L. Ed. 494), the Supreme Court in referring to this statute said:

"At common law it was neither necessary to aver nor prove an overt act in furtherance of the conspiracy, and indictments therefor were of such general description that it was customary to require the prosecutor to furnish the defendant with a particular of his charges. (Citing cases.) But this general form of indictment has not met with the approval of the courts in this country, and in most of the states an overt act must be alleged. The statute in question changes the common law only in requiring an overt act to be alleged and proved."

Aside from this statutory requirement the rule is that an indictment for conspiracy, like any other indictment, is sufficient if the facts stated fairly and reasonably inform the accused of the offense with which he is charged. Lanasa v. State, 109 Md. 602, 608, 71 Atl. 1058.

In Cochran and Sayre v. United States, 157 U. S. 286, 290, 15 Sup. Ct. 628, 630 (39 L. Ed. 704), the Supreme Court, discussing the sufficiency of indictments, said:

179 F.—38

"The true test is, not whether it might possibly have been made more certain, but whether it contains every element of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction."

Under this rule the indictment in this case is not only sufficient in general terms, but it is technically sufficient, for it apprises the defendant of the precise charge he is called upon to answer. It is true that Ormsby is not named as a defendant or charged as a co-conspirator; but what is of more importance to the accused in preparing his defense, the indictment informs him precisely what relation Ormsby had to the conspiracy. In two of the overt acts charged in the indictment Ormsby's connection with the conspiracy is fully and correctly stated. In the second overt act charged it is alleged that Binger Hermann, as Commissioner of the General Land Office, called upon Ormsby, as Forest Superintendent in Oregon, by letter requesting a report as to the advisability of making the proposed forest reserve. In the third overt act charged it is alleged that the defendant Mays bribed Ormsby to report in favor of establishing the reserve. An indictment of this character is to be commended rather than criticised. It answers fully the technical requirements of good pleading. To have charged Ormsby as a co-conspirator would undoubtedly have been sufficient, but it would have left the defendant uninformed as to the particular acts Ormsby was charged to have committed as a party to the conspiracy.

But what was the effect of the omission of Ormsby's name as a defendant from the indictment in view of the admission of the attorney for the United States that Ormsby was a conspirator and assuming that it was intended to include him in the allegation of the indictment as a person to the grand jurors unknown? Was it a fatal variance in the indictment that Ormsby was described as a person to the grand jurors unknown, when it appeared from the evidence that he was known? Plaintiff in error contends that it was, and cites Wharton on Criminal Evidence in support of this position. Section 97 of that work states the rule as follows:

"When a third person is described as 'a person to the grand jurors unknown,' and it turns out that he was known to the grand jurors, the variance is fatal."

In 10 Encyc. of Pl. & Pr., pp. 505–6, the rule is stated as follows:

"In many offenses the names of third persons necessarily enter for the identification as well as material description of the offense, and, under the rule in criminal pleading requiring such certainty as will notify the defendant of the nature of the charge against him, the names of such third persons should be alleged, and the defendant cannot be convicted if the names are so erroneously stated as to fail to identify the offense, though certainty to a common intent is generally sufficient. * * * If the name is unknown, that fact may be so stated. * * * But such a statement is only permissible where the names are in fact unknown, and, if that allegation be shown to be untrue, the defendant will be entitled to an acquittal."

A number of cases are cited in support of this rule, but they are cases where the name of the third person, if known, was essential to

the material description of the offense, as where the third person was either the victim of, or the principal actor in, the criminal act, and it was only when the name of such third person was unknown and could not be ascertained that the grand jury was permitted to so charge and the indictment would be held sufficient. Such cases were murder of an unknown person, adultery with an unknown woman, assaults upon an unknown person, receiving bribes from an unknown person, or receiving stolen goods from unknown persons, selling liquors to unknown persons, failing to provide slaves, whose names were unknown, with food, and similar cases where the name of the third person involved was a necessary part of the identification and a material description of the offense, and generally could be ascertained if knowledge of the offense itself could be obtained. But none of the cases cited charge the crime of conspiracy. In such a case we think the correct rule was declared in the leading case of People v. Mather, 4 Wend. (N. Y.) 229, 21 Am. Dec. 122, which was a case of conspiracy, and where it was held by the Supreme Court of New York that an indictment charging that the defendant with divers persons unknown to the jurors, conspired, combined, etc., was sufficient, notwithstanding that some of the conspirators described as unknown were in fact known to the grand jury. The same rule was followed in the recent case of People v. Smith, 239 Ill. 91, 107, 87 N. E. 885, 891, 892, where it was charged in the indictment that certain named defendants conspired and confederated together, "with divers other persons whose names were unknown," to obtain money and other property by false pretenses. It appeared upon the trial that a certain other person was known to the grand jury as a conspirator, and it was contended that he should have been specifically named in the indictment, and not referred to in the general description that he was unknown to the grand jury. It was held by the Supreme Court of Illinois that the fact that a conspirator was designated as unknown when the proof was that he was known to the grand jury was not fatal to the conviction of the others. The court in its opinion said:

"It is also said that the parties to the conspiracy are improperly described in the indictment; it being urged that Robert H. Howe was in the conspiracy, and that, as that fact was known to the grand jury, he should have been specifically named in the indictment and not been referred to under the general description that he was unknown to the grand jury. This phase of the argument proceeds upon the hypothesis that the persons who enter into a conspiracy so form a part of the offense as to be descriptive of the offense, and that a misdescription of the parties who are engaged in a conspiracy is fatal. The logic of this position is, if too many or too few are named in the indictment, there must be an acquittal of all. This cannot be the law. Clearly, if three persons are named in an indictment as conspirators, two may be convicted and one acquitted, and, if two or more are named in the indictment, it would be no defense to prove that some one not named in the indictment was a party to the conspiracy. We are satisfied the great weight of authority is to the effect that the persons engaged in a conspiracy are not so far a part of the offense as to be said to be descriptive of the offense, and the fact that a conspirator is designated in the indictment as unknown, when he is known, to the grand jury, is not fatal to a conviction."

We think these cases state the rule correctly where the charge is one of conspiracy. But we prefer to place our decision in the present

case on the ground that there was no variance between the proofs and the allegations of the indictment. The name of Ormsby and his connection with the case was known to the grand jury, and he and his acts were properly described in the indictment.

It is objected by plaintiff in error that there was no evidence tending to show that Hermann, one of the defendants, was a member of the conspiracy, and it is claimed that it was therefore error to submit to the jury the letter of Hermann's to Ormsby charged in the indictment as an overt act; the letter itself not being evidence of a conspiracy. The plaintiff in error refers to certain other official letters written by Mr. Hermann in the course of official business as Commissioner of the General Land Office concerning the proposed Blue Mountain Forest Reserve, and the testimony of one Callahan concerning the conversation he had with Mr. Hermann in his office in Washington about November 10, 1902, upon the same subject. Plaintiff in error says "that the testimony of Mr. Callahan was that he talked with Mr. Hermann about the proposed Blue Mountain Forest Reserve, and that he suggested the school lands should not be included; that Mr. Hermann urged that the school lands should be included as it would benefit the people of the state of Oregon in the sale of the school lands; that Mr. Hermann knew that the school lands had been taken by individuals, but said to let it go; that it would be citizens of Oregon who would be beneficiaries as well as the state." It is claimed by plaintiff in error that with the official letters referred to this was all the evidence against Mr. Hermann, and that it did not tend to show that he was involved in the conspiracy. We do not think that this evidence should be laid aside as entirely colorless and without significance in showing Hermann's relation to the conspiracy, particularly in view of other testimony we find in the record. The testimony of the witness Callahan appears to be more significant than the brief summary made by the plaintiff in error would indicate. The witness says that in the conversation with Mr. Hermann, the latter referring to the fact that the school lands in the proposed reserve were in the hands of individuals and the witness had urged that that land should be eliminated, said to witness:

"Callahan, why bother about it? It don't amount to very much; it only amounts to about 200,000 acres, and it is citizens of Oregon that will be beneficiaries in the matter as well as the state"

—and then Hermann went on to name several citizens that were interested in the matter. He (the witness) did not know all of them at the time. Hermann named among others Mr. O'Dell and Mr. Mays, and some two or three other persons whose names the witness could not recall.

Here was testimony to the effect that Hermann favored the proposed reserve; that he knew the quantity of school lands within its proposed boundaries; that these lands were in the hands of individuals, and that citizens of Oregon, including the defendant Mays, were to be the beneficiaries in having such lands included in the reservation. From such testimony the jury had the right to infer that Hermann had something more than an official interest in establishing a reserve

which would include 200,000 acres of school lands for which lands of much greater value could be selected outside of the reservation by the individuals who had obtained the school lands in anticipation of the reserve being made.

We are also of opinion that the testimony of the witness S. A. D. Puter tends to connect Mr. Hermann with the conspiracy. His testimony cannot be reduced to a brief enough form to be incorporated in this opinion, but it is sufficient to say that he was familiar with the fraudulent character of some of the lieu land selections in Oregon, having been engaged in that business himself and he knew something of the work of the defendant Mays in having the Blue Mountain Forest Reserve established. The witness testified that in a conversation with the defendant Mays he said to him:

" 'Mays, how about this forest reserve that you are creating?' He says: 'What do you want to know about it?' I said: 'You recollect some time ago in conversation with me on the street you told me you wanted me to raise ten or fifteen hundred to help pay your expenses to Washington City; that you expected to apply for something big, and I would be in on it.' I said, 'I have just heard you bought some twenty or thirty thousand acres of school lands, and is this the way you let a fellow in?' And Mr. Mays said that he thought I had all the irons I could attend to then in the fire."

This witness also testified that in April, 1902, he went East from Portland with Mr. Mays, and had a conversation with him in relation to the Blue Mountain Reserve. "I asked Mr. Mays," says the witness, "what big thing he expected to 'pull off' while in Washington City, that he spoke to me about some several weeks before. He said he had several propositions in view; the principal one was the creation of a timber preserve. I asked him where he expected to create a timber reserve, and he said in the Blue Mountains, and I then said: 'Don't you think you will have a good deal of opposition from that?' He said: 'Not at all. I don't expect any.' He says: 'You know I have a good deal of influence in Washington now. Senator Mitchell is there to help me out, and you know how Binger Hermann stands in, and I don't anticipate any trouble about creating the reserve.' And then I spoke to him about what he thought of annexing a few townships on the west side of the reserve. He thought it was a pretty good plan if we could get any scrip land."

We think this testimony tended to show that Hermann was involved in the conspiracy to establish this reserve for the benefit of individuals, including the defendants.

It was objected that there was no evidence tending to show that Mitchell, one of the defendants, was a member of the conspiracy, and it is claimed that it was, therefore, error to submit to the jury the letter of Mitchell to Hermann, charged in the indictment as an overt act; the letter itself, like the letter of Hermann to Ormsby, not being evidence of a conspiracy. Mitchell was at that time United States Senator from Oregon. The testimony against him is of a similar character as that against Hermann. It consists of a letter signed by Mitchell and addressed to Hermann, informing him that he had forwarded to the Secretary of the Interior petitions numerously signed praying for the establishment of a forest reserve in Oregon. This

letter is charged as an overt act in the indictment. There was also introduced in evidence a letter signed by Mitchell addressed to the Secretary of the Interior, transmitting petitions for the establishment of the forest reserve in Oregon, and the stenographic notes of letters dictated by Mitchell and taken down by his private secretary and written out by typewriter, signed and mailed to the parties to whom they were addressed. These letters referred to the proposed forest reserve; but it is said that they were such letters as any senator might write to his constituents with relation to matters before the department, and do not show that he was involved in the conspiracy. Read in the light of the other testimony in the case this explanation is not satisfactory. The evidence is full and complete that the defendants Mays and Jones conspired together to secure the establishment of the Blue Mountain Forest Reserve; that when they were assured that such action would be taken by the Land Department of the government they would acquire the state title to the school lands within the proposed reserve, and after the reserve had been established they would have the right to select lands outside of the reserve in lieu of these school lands within the reserve. It appears that they could obtain the title to the school lands from the state for $1.25 per acre; that after the establishment of the reserve the right to make selections outside of the reserve in lieu of the school lands within the reserve would be worth from $3.50 to $4.50 per acre. It was for the purpose of obtaining this profit of from $2.25 to $3.25 per acre that the conspiracy was formed and promoted. Among the stenographic notes of letters introduced in evidence was one from Senator Mitchell dated June 15, 1902, and addressed to George H. Cattanach, attorney at law, Canyon City, Or., from which it appears that Cattanach had objected to the proposed reserve. To this letter of objection Senator Mitchell replies informing Cattanach that an application had been filed for the establishment of such a reserve, and that the application had been referred to a special agent for investigation and report, and his impression was that it had been referred to S. B. Ormsby, Superintendent of Forest Reserves in Oregon. The letter says:

"I note your objections and will see to it that they are brought to the attention of the proper department, and will see to it that all parties have full opportunity to be heard."

On the same day Senator Mitchell sent a letter to the defendant Mays at Portland, Or., as follows:

"I beg to hand you the inclosed letter from friend Cattanach in strict confidence, in order that you may know just what some people are thinking about in his end of the state in regard to the proposed reserve. Please return to me after having read. I simply want you to know what is being done. I inclose you a copy of my answer, which of course is the only thing I could do. I don't know whether any report had been made yet or not. I thought if you had knowledge of this move it might be of benefit to you. But under no circumstances permit it to be known by any one that I have shown you this letter."

It is evident that this letter contained important information for the conspirators. If there was opposition to the establishment of the reserve it was vital to the scheme that they should be informed at once

so that they could meet, and, if possible, overcome it. Senator Mitchell promptly furnished this information to one of the conspirators in strict confidence, thinking, as he said, that the knowledge of this move might be of benefit to him. The sending of such a letter was something more than the service that a senator is ordinarily called upon or expected to render to a constituent, and the jury was clearly entitled to give it such consideration in that respect as all the surrounding circumstances seemed to warrant. The indictment charged that 20,000 acres of poor timber lands lying in the county of Crook was to be fraudulently obtained by the defendant Williamson from the United States by persons who would be acting as his agents, and who would not be in good faith purchasing the same for their own use and benefit. This land, like the school land, was to be within the boundary of the Blue Mountain Forest Reserve and after its establishment the land would be exchanged under the law for land outside the reserve. In connection with this charge the last overt act alleged in the indictment was the sending of a letter of John N. Williamson from The Dalles, Or., to Binger Hermann at Washington recommending the creation of the Blue Mountain Forest Reserve with certain described boundaries and the reasons why the reserve should be established. This letter was introduced in evidence together with the answer of Binger Hermann declining to include certain areas described in the Williamson letter in addition to the previous temporary withdrawal, but stating that the reasons favoring the reservation of the general areas would be of value in the pending consideration of the proposed reserves. Upon the trial the government offered no proof tending to show the acquisition of any such timber lands as alleged in the indictment relating to these lands, and the charge was withdrawn from the consideration of the jury, and the jury instructed to disregard the averment of the indictment relating to such lands.

The indictment also charged that 30,000 acres of other school lands had theretofore been fraudulently obtained by the defendants from the state of Oregon by the same fraudulent means as had been described, and these lands were to be exchanged for public lands outside the reservation. The court instructed the jury, with respect to the evidence in support of this charge, that the defendants could not be convicted with any fraud connected with the alleged acquisition of the 30,000 acres which might have been acquired by the defendants or any of them prior to February 27, 1901; but instructed the jury that the testimony concerning the acquisition of these 30,000 acres had been and was relevant as bearing upon the question of the intent and knowledge or design of the defendants against whom such evidence had been offered, in the acquisition of other school lands, which the testimony goes to show were acquired in 1902. The court informed the jury that the defendant Mitchell was dead; and that Hermann and Williamson were not on trial; and that the only verdict the jury was called upon to render was whether the defendants Mays, Jones, and Sorenson, or any of them, were guilty or not guilty of the conspiracy charged in the indictment. The question of the guilt or innocence of Williamson on this indictment was therefore not before the

jury. It is nevertheless contended that the court was in error in re-- fusing to give the following instruction requested by the plaintiff in. error:

"If the jury believe from the evidence that the defendant Williamson was in a conspiracy, such as is described in the indictment, with Boggs or other persons not mentioned in the indictment, and that the defendants Mays, Jones, and Sorenson, or any of them, either with one another or other per- sons not mentioned in the indictment were in a conspiracy, but that there was no common understanding or agreement between the two groups, but that each group was acting for itself and independent of the other, then you must find the defendant not guilty."

That the court was correct in refusing this instruction was obvious. The government was not required to establish every allegation con- tained in the indictment. It was not required to prove that all the overt acts alleged were committed, nor was it required to prove that all the defendants named in the indictment were engaged in the conspiracy. It was sufficient to constitute the conspiracy charged in the indictment. to show that there was a combination of two or more persons to de- fraud the United States and that one or more of such parties did an act to effect the object of the conspiracy charged. If the evidence tended to show that Williamson and others were engaged in a separate and distinct conspiracy as the plaintiff in error seems to contend, the indictment remained good as against those charged with the conspir- acy alleged in the indictment, and the defendants were not prejudiced by the fact that the evidence relating to another conspiracy was not proven and not submitted to the consideration of the jury.

The witness S. B. Ormsby was asked by the attorney for the Uni-- ted States the following question:

"Captain, before you went up on May 5, 1902, to look over this land, did you inform your son you had received this letter of instructions of March 11, 1902?"

—referring to the letter of Binger Hermann as Commissioner of the General Land Office to S. B. Ormsby as Forest Superintendent re- questing an examination and report as to the advisability of making the proposed reserve. It was objected to this testimony that it was incompetent, immaterial, and irrelevant, as the declaration of a sup- posed conspirator. The objection was overruled, and the witness an- swered, "No"; but subsequently corrected his testimony by saying that he returned from the Dalles about March 22, 1902, and a day or two after he had a conversation with his son at Salem; no one else was present. His son said that he had heard there was going to be a reserve established, or there was a movement made to establish a re- serve in Eastern Oregon. The witness said to his son, "Yes, there is going to be." It was objected that this testimony was immaterial and irrelevant, and called for the declaration of a supposed conspira- tor. The objection was overruled and an exception allowed. It is contended that this conversation between the witness and his son in the absence of the defendant Jones was immaterial and irrelevant, and assuming that Ormsby was a conspirator, as the evidence on the part of the prosecution tended to show, it is contended by the plaintiff in error that it was not admissible, for the reason that acts and declara-

tions of a conspirator cannot be admitted as against a co-conspirator, unless such acts were performed or declarations made in aid or execution of the conspiracy which did not appear to be the fact with respect to this statement. The rule to which reference is here made is a rule that has been stated in relation to the time when the declaration is made or act done. It must be a declaration made or act done during the pendency of the conspiracy to be admitted in evidence. After the conspiracy has come to an end, whether by success or by failure, the admissions of one conspirator by way of narrative of past facts is not admissible in evidence as against the others. This rule as stated in Greenleaf on Evidence (16th Ed.) § 184a (111), is as follows:

"The connection of the individuals in the unlawful enterprise being thus shown, every act and declaration of each member of the confederacy, in pursuance of the original concerted plan, and with reference to the common object, is, in contemplation of law, the act and declaration of them all; and is therefore original evidence against each of them. * * * But * * * care must be taken that the acts and declarations, thus admitted, be those only which were made and done during the pendency of the criminal enterprise, and in furtherance of its objects."

Are we to understand that this last clause of the rule qualifies the rule as first stated, requiring that the declaration to be admitted in evidence must, like the act, have been in furtherance of the object of the conspiracy? If so, then an admission or statement not in furtherance of the object of the conspiracy would not be admissible although part of the res gestæ.

In Logan v. United States, 144 U. S. 263, 309, 12 Sup. Ct. 617, 36 L. Ed. 429, and in Brown v. United States, 150 U. S. 93, 98, 14 Sup. Ct. 37, 37 L. Ed. 1010, the rule was thus stated as excluding the admissions made by a co-conspirator after the conspiracy had ended, but for no other purpose. The admissions having been made after the conspiracy had come to an end, they were not admissible as part of the res gestæ, but in the present case the statement was made while the conspiracy was in progress, related to the object of the conspiracy, and was therefore part of the res gestæ.

In United States v. Gooding, 12 Wheat. 460, 469, 6 L. Ed. 693, the declarations of a master of a vessel engaged in the slave trade relating to the object of a voyage then in progress were admitted in evidence against the owner as part of the res gestæ.

In American Fur Co. v. United States, 2 Pet. 358, 364, 7 L. Ed. 450, the Supreme Court stated the rule as follows:

"Where two or more persons are associated together for the same illegal purpose, any act or declaration of one of the parties, in reference to the common object, and forming a part of the rest gestæ, may be given in evidence."

In Nudd v. Burrows, 91 U. S. 426, 438, 23 L. Ed. 286, it was held that the declaration of a bankrupt made at and prior to the payment of money to a creditor pursuant to a conspiracy to give the creditor a fraudulent preference was admissible in evidence as part of the res gestæ, although made in the absence and without the knowledge of the creditor.

In St. Clair v. United States, 154 U. S. 134, 149, 14 Sup. Ct. 1002, 1008 (38 L. Ed. 936), the defendant with others was charged with the

crime of murder on board an American vessel. The acts, appearance, and declarations of two of the conspirators relating to the crime were admitted in evidence against the defendant as part of the res gestæ. The court, in discussing the exception taken to the admission of this testimony, said:

"The acts, appearances, and declarations of either, if part of the res gestæ, were admissible for the purpose of presenting to the jury an accurate view of the situation as it was at the time the alleged murder was committed. Circumstances attending a particular transaction under investigation by a jury, if so interwoven with each other and with the principal fact that they cannot well be separated without depriving the jury of proof that is essential in order to reach a just conclusion, are admissible in evidence. 'These surrounding circumstances constituting part of the res gestæ,' Greenleaf says, 'may always be shown to the jury along with the principal fact, and their admissibility is determined by the judge according to the degree of their relation to that fact, and in the exercise of his sound discretion; it being extremely difficult, if not impossible, to bring this class of cases within the limits of a more particular description.' 1 Greenleaf (12th Ed.) § 108. See, also, 1 Bishop's Cr. Pro. §§ 1083–1086. 'The res gestæ,' Wharton said, 'may be, therefore, defined as those circumstances which are the undesigned incidents of a particular litigated act, and which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time more or less appreciable. They may consist of speeches of any one concerned, whether participant or bystander; they may comprise things left undone as well as things done. Their sole distinguishing feature is that they should be the necessary incidents of the litigated act; necessary in this sense, that they are part of the immediate preparations for or emanations of such act, and are not produced by the calculating policy of the actors. In other words, they must stand on immediate causal relation to the act—a relation not broken by the interposition of voluntary individual wariness seeking to manufacture evidence for itself. Incidents that are thus immediately and unconsciously associated with an act, whether such incidents are doings or declarations, become in this way evidence of the character of the act.' "

In Wiborg v. United States, 163 U. S. 632, 657, 16 Sup. Ct. 1127, 1137 (41 L. Ed. 289), the indictment charged certain persons with a violation of the neutrality laws in setting on foot, providing and preparing the means for a military expedition against the territory of a foreign prince with whom the United States was at peace. One of the questions in the case was as to the destination of the expedition, and as evidence of this fact declarations of members of the party during the voyage as to their purposes were introduced in evidence. The testimony was held admissible under the rule stated in American Fur Co. v. United States, supra. To this rule the court added this:

"The declaration must be made in furtherance of the common object, or must constitute a part of the res gestæ of acts done in such furtherance."

Under the rule as thus stated there can be no question but that the testimony of Ormsby as to the statement he made to his son while the conspiracy was in progress, that a reserve would be established, was part of the res gestæ, and was properly admitted in evidence.

There was testimony tending to show that one H. A. Smith was a member of the conspiracy described in the indictment. He died on the 18th of May, 1902, and as the indictment was not filed until February 13, 1905, he was not named as a defendant. Smith left a will in which the plaintiff in error and one E. F. Flegel were named as

executors. The executors qualified and took possession of the estate of the deceased. Flegel was called as a witness on behalf of the United States, and as part of his testimony the United States offered in evidence a certified copy of an inventory of the Smith estate. The inventory contained amongst other things an appraisement of a one-third interest in certain lands represented by school certificates, covering about 25,000 acres in the proposed Blue Mountain Reserve. The certificates were held by F. P. Mays as collateral security for moneys advanced by him to decedent. The interest of the deceased in these certificates was appraised at $9,000. The plaintiff in error had told the witness that the interest of decedent in the land was as represented in the inventory, and the witness had prepared the inventory from information supplied by the plaintiff in error. The witness had talked with Mays about it and arranged with Mays for the sale of Smith's interest in the property. Mays consented to the arrangement. It was necessary to sell some of the property in the estate to pay the debts, amongst others, the debt due to Mays. When he sold Smith's interest it was necessary to segregate it. It was preferable to sell the land in a different method from an ordinary executor's sale, and the Smith heirs consented to the segregation of the interest. The agreement was that out of the whole acreage a certain portion of it should be deducted to cover expenses of the transaction. There were six sections deducted from the whole 25,000 acres, and one-third of the balance was set aside from the Smith estate to be sold and was sold. The plaintiff in error conducted the sale which was made about November 13, 1902. The sale was made for over $10,000, and the money was received and placed to the credit of the executors. The witness said that all of the land was within the limits of the proposed forest reserve; that plaintiff in error had said nothing specific at all concerning the amount and character of the expenses which had been incurred in acquiring the 25,000 acres; that the sections taken out of the 25,000 acres were, as the witness understood, for the future expense of getting the title. The number of acres sold was 6,720 acres. The witness identified a paper as the objections on the part of B. F. Smith to the final account of the executors on account of the sale of the school-land certificates, but testified that he never saw the paper before, the paper having been filed on June 23, 1905. B. F. Smith was a son of the deceased. The plaintiff in error objected to this paper on the ground that it was incompetent, immaterial, and irrelevant. The objection was overruled; to which ruling the plaintiff in error excepted. This paper was an objection by B. F. Smith to the final account reciting that the inventory showed a one-third interest in about 25,000 acres of school land; that the executors had sold 6,780 acres; that the land was worth $5 per acre in open market; that the interest of Smith in the land was worth in the open market $41,666.65; that the executors had accounted for $7,660.80; that they should be charged with the real value of the land. B. F. Smith was subsequently called as a witness on behalf of the United States, and testified that he had made the objections referred to in the writing; that he had not consented to the sale of the land or the segregation of the said sections

for expenses. The admission of this testimony concerning the objection to the final account is assigned as error.

The objection is that it tended to show that the plaintiff in error had been guilty of a breach of trust, or had not properly performed his duties as executor of the estate of H. A. Smith, deceased. There is nothing in the record indicating that the testimony was introduced for any such purpose, nor does it appear that it was ever suggested that it had any such aspect. When it was offered it was stated by the counsel for the prosecution that the document setting forth the objection to the final account was not offered as evidence of the truth of the recital, but simply to show that the objection was made. The witness Flegel testified that the objection was never urged; that the lands were sold under the order of the county court, the final account of the executors was approved, and the estate distributed. It appears further from the testimony of the witness that B. F. Smith did not appear in court when the final account was settled. The objection was never served on the witness, and he had no knowledge of it until the morning he appeared on the stand; and no issue of fact raised by the objection was tried in settling the account. It appears from the testimony that in settling up the partnership interest in these school-land certificates between Mays, the deceased, and the plaintiff in error, six sections were deducted from the whole lot of certificates representing about 25,000 acres for the purpose of paying certain expenses incurred in acquiring the land. The effort of the prosecution was to ascertain what these expenses were, and to bring out this fact the objection to the deduction in the final account was called to the attention of the witness. Two sections had been given to Ormsby for his services in creating the reserve, and the effort was to obtain from the witness information as to the use made of the other four sections. The effort does not appear to have been successful, but the quest was a proper procedure and we do not see how the fact that the testimony might tend to establish a breach of duty on the part of the plaintiff in error in some other relation rendered the evidence inadmissible in this case. In State v. Adams, 20 Kan. 311, 319, Mr. Justice Brewer, afterwards a Justice of the Supreme Court of the United States, said:

"Whatever testimony tends directly to show the defendant guilty of the crime charged is competent; though it also tends to show him guilty of another and distinct offense. A party cannot by multiplying crimes diminish the volume of competent testimony against him."

As stated by the Supreme Court in St. Clair v. United States, supra:

"Circumstances attending a particular transaction under investigation by a jury, if so interwoven with each other and with the principal fact that they cannot well be separated without depriving the jury of proof that is essential in order to reach a just conclusion, are admissible in evidence." See, also, Wigmore on Evidence, § 216.

S. A. D. Puter, a witness for the United States who had been indicted, tried, and convicted in 1904 for a conspiracy with certain named defendants to defraud the United States out of certain public lands, testified as to transactions he had with the defendant Mays and the

plaintiff in error in relation to public lands. This testimony tended to show that he had been engaged with them in various fraudulent transactions relating to public lands, and that after his conviction they had shown a disposition to abandon them, refusing to furnish him with a bail bond pending a motion for a new trial in his case. On cross-examination on behalf of the defendant Jones, the witness was asked:

"Q. Mr. Puter, you said you had quite a feeling against Mr. Mays? A. Yes, sir. * * * Q. You went to see him to see if he would not get bonds for you? A. Yes, sir; when I was in charge of the marshal. The marshal stood outside the door, and I went in and had a conversation with Mays of half an hour, and this is when he passed me up like a white chip, didn't know me— had nothing to do with me. I says, 'Mr. Mays, all you have to do—you don't have to be mixed up in it, you know hundreds of people in town; just give me the names and telephone them. I have got three parties now; all I want is another extra thousand dollars, and I want some consideration from you, Mr. Mays. You are in this deal with me—you are in all of my deals—and I don't want to be treated like this. All I want is justice to show your good faith with me.' He passed me up; wouldn't have anything to do with me. He was my attorney right up to three days before that. So I went out and telephoned home for the money and put up my bonds, and that is when I went out, and Mr. Jones came up to the hotel and spoke to me. Q. From the time he refused to furnish you bonds or to get anybody else to do so you resolved to get even? A. The conversation was enough after being twelve years partners in all kinds of schemes, and an attorney during that time; and when he saw that I was down, convicted, and out, and slandered, he concluded the only way he could do was to pass me up and have nothing to do with me. He was an attorney, state senator, well up in politics, and he could ride over and clear himself, and my word would not go. He showed that in his actions; actions, a good deal, speak louder than words. I think I had good reason then, and I have now, and all I regret now is that I was not mixed up in the Blue Mountain deal, so that I could tell a great deal more than I have already told. I have only told what I know. If I was in the deal, I would tell it all. Q. You are very sorry that you could not tell more? A. Yes, sir; I think I have good reason. Q. You said you were very angry at Mays and others. Does that include Jones? A. Yes, sir; I thought Jones, being a partner with me for two years in the biggest kind of a steal over here, and in with him and Mays, that he ought to come to my rescue. * * * * "

On redirect examination the attorney for the United States asked the witness the following question:

"Q. As to that question in regard to Jones, what was this steal that you referred to that you were in with Jones on?"

Counsel for the defendant asked:

"Q. I would like to know, Mr. Puter, what time this transaction you have just referred to occurred; how long ago? A. It was just about the second or the first day after I had given the bonds. Q. You do not understand me. You referred to being in a steal with Mr. Jones. A. Oh, that was during our partnership. Q. How long ago was that? A. That was during the time Gov. Pennoyer was Governor of the state for two years."

To which evidence and the whole thereof the defendant objected, and moved to strike out as incompetent, immaterial, and irrelevant, and as not relating to any transaction in this indictment and as incompetent against one defendant charged with conspiracy. The court ruled that the answer of the witness should stand, but the defendant could bring out what he meant by the use of the word "steal." The

defendant insisted upon his motion to strike out, which, being over-ruled, is assigned as error.

· : It is contended that the answer was not responsive to the question asked, and was thrown into the case by the witness to gratify his malice against the plaintiff in error. The purpose of the cross-examination was to discredit the witness before the jury on the ground that he was biased and prejudiced against the defendant, and the testimony did undoubtedly tend to show that fact. It tended to show further that he was actuated by a spirit of revenge against the defendants Mays and Jones in appearing as a witness for the prosecution, but that was precisely what the defendant was endeavoring to show by the cross-examination of the witness that his testimony might be discredited. The objection that the statement had reference to a steal committed many years before, and not related· to any transaction alleged in the indictment, did not reach the real question before the court. It was not something that the prosecution was trying to prove. It was a reply to a question on cross-examination explaining why a friendship of long standing with the defendant Jones had been turned to anger. We see· no error in the ruling of the court allowing the answer of the witness to stand.

There was introduced in evidence a letter of Binger Hermann, Commissioner of the General Land· Office, dated July 22, 1902, addressed to the Secretary of the Interior recommending the creation of the Blue Mountain Forest Reserve and the temporary withdrawal of the lands proposed to be included within the reserve; also a letter of the Acting Secretary of the Interior dated July 24, 1902, addressed to the Commissioner of the General Land Office, directing the withdrawal of lands as recommended by the Commissioner of the General Land Office, and evidence that the withdrawal was given out and published in a paper in Portland, Or., a day in advance of the withdrawal. Evidence was also introduced tending to show that Binger Hermann resigned the office of Commissioner of the General Land Office in November or December, 1902, upon the request of the Secretary of the Interior, with the approval· of the President; that the Secretary of the Interior informed the Commissioner that his administration of the affairs of the Land Office was unsatisfactory, and that the matters coming to his knowledge regarding certain maladministration were of such grave character as to render his continuation under him, a large bureau of the department, unsatisfactory; that he had submitted the matter to the President, and the President had authorized him (the Secretary) to request Mr. Hermann's resignation. It was objected to this testimony that it was incompetent, immaterial, and irrelevant, and not the best evidence, and was hearsay. The objection was overruled, and the testimony was admitted. The action of the court in admitting the testimony is assigned as error.

The indictment charged Binger Hermann as one of the conspirators in the scheme to defraud the United States out of lands in the creation of the Blue Mountain Forest Reserve. He was the official under whose administration of the General Land Office the scheme could be carried out if he was friendly, but which might fail if he was un-

friendly. The testimony tends to show that he was friendly and recommended the creation of the reserve and the withdrawal of the lands within its proposed boundaries for that purpose. It was important to those interested in securing the school lands within the proposed reserve that they should know in advance when the lands for the reserve were to be withdrawn and the boundaries of the reserve. This information could be obtained from the Commissioner of the General Land Office. Clerks in the Land Office were not permitted to give out news nor were reporters permitted to ask them for such information. The fact that the defendants Mays, Jones, Smith, and others purchased a large quantity of school lands within the proposed reserve upon the knowledge that the lands were to be within the boundaries tended to show that someone connected with the General Land Office had furnished the desired information. The evidence tended to show that the furnishing of this information in advance of the actual withdrawal was a violation of the rule of the Department of the Interior. Testimony was also introduced tending to show that Hermann's removal as Commissioner of the General Land Office was due to dissatisfaction on the part of the Secretary of the Interior because of the fact that Hermann did not give him certain information in regard to the creation of forest reserves, and that in July, 1902, the Secretary was watching the matter of the creation of forest reserves very closely. In this state of the evidence we do not think the court erred in admitting evidence tending to show that Mr. Hermann did not resign voluntarily, but because the Secretary of the Interior was dissatisfied with his administration of the office of Commissioner in failing to give the Secretary information in regard to the creation of forest reserves and that his resignation was requested by his superior.

W. Scott Smith, a witness for the United States, was the private secretary to the Secretary of the Interior. He testified as to the business methods and procedure of the land divisions of the Interior Department. He was asked on cross-examination as to the number of clerks employed in these various divisions. His reply was that in the forest division there were 30 or 40; in the law division, 12 or 15; in the lands and railroad division, 10 or 12; and in the geological department, several hundred. He was asked if these various clerks were not importuned by reporters to get anything they could in the way of public news, to which the witness replied, "Not if it was known." He further answered that they were not permitted to give out news, nor were they permitted to ask for it. The object of this cross-examination was obviously for the purpose of showing that, when the creation of a forest reserve was contemplated by the department, information of this fact could be obtained in advance from the clerks of the department as well as from the Commissioner of the General Land Office. At this state of the examination the attorney for the United States said to the witness:

"They (referring to the clerks) might be bribed? You have known of them being bribed by Hyde and Benson, haven't you?"

The witness answered:

"Yes. Q. In order to get these very things? A. Yes, sir. Q. In regard to giving our forest reserves? A. Yes, sir."

The defendants objected to this testimony, and moved to strike out the questions and answers on the ground that the evidence was incompetent and immaterial, not the best evidence, and hearsay. We think the questions and answers were both competent and material and not subject to the other objections. The testimony up to this point tended to show that information had been given out at the General Land Office or Interior Department concerning the proposed creation of the Blue Mountain Forest Reserve. The effort on the part of the prosecution was to show that this information had been given out by Commissioner Hermann or Senator Mitchell or both. The effort on the part of the defense was to show by the cross-examination of this witness that this information could have been obtained by the newspaper reporters from the clerks in the department, but his testimony was not aiding this defense; on the contrary, it was tending to close that door effectively when the attorney for the United States suggested that the clerks might be bribed to furnish this information as they had been by Hyde and Benson. The effect of these questions, although probably not so intended, was to bring out testimony wholly inconsistent with the theory of the case as maintained by the prosecution against all of the defendants, and particularly against the theory of the case as against the defendants Mitchell and Hermann. Under this state of the evidence and the theory of the prosecution we do not see how we can speculate as to the probability of the jury believing that the defendants bribed the clerks in the department. The probability is altogether too remote. There is nothing in the case to support it. We do not see how the answers of the witness under the circumstances prejudiced the case of the defendants.

The testimony showed that the plaintiff in error had purchased a large amount of school lands from the state of Oregon in the year 1900; that these lands were purchased through dummies, and the titles were therefore fraudulent. The plaintiff in error contends that this was long prior to the date of the alleged conspiracy mentioned in the indictment; that the sale of these lands had been ratified by an act of the Legislature; and that the purchase was therefore valid. The court instructed the jury upon this feature of the case as follows:

"The indictment also charged that there were 30,000 acres of school lands, which, it is alleged, had been previously fraudulently obtained by the defendants from the state of Oregon by fraudulent means like those by which the other school lands were to be obtained, as alleged; but after consideration of the legal questions presented in the argument had before me at the close of the evidence, I instruct you that you cannot convict the defendants, or any of them, of any fraud connected with the alleged acquisition of the 30,000 acres which may have been acquired by the defendants or any of them prior to February 27, 1901. * * * The testimony, however, concerning the acquisition of these 30,000 acres is admitted before you, and is relevant as bearing upon the question of the intent and knowledge or design of the defendants, against whom such evidence is offered in the acquisition of other school lands, which the testimony goes to show were acquired in 1902."

The lands here referred to were school lands which the defendants Jones and Mays caused to be included within the Blue Mountain Forest Reserve. But it is contended on the part of the plaintiff in error that as these lands were acquired from the state prior to February 27,

1901, when their sale by the state was ratified by the Legislature, the evidence relating to these lands should have been excluded by the court from the consideration of the jury, not only as evidence of fraud connected with their acquisition, but as bearing upon the question of intent and knowledge or design. The objection is that there was no evidence to indicate that there was in the year 1900 any intention on the part of any one to create the Blue Mountain Forest Reserve, or any knowledge that such a reserve would be created; that the earliest date when the scheme to create this reserve began to take shape was in October, 1901, when H. A. Smith, one of the alleged conspirators, proposed to one A. G. King, at that time clerk of Malheur county, to circulate petitions in Malheur and Harney counties for the creation of the reserve. The evidence tends to show that Smith introduced King who was then in Portland to the defendant Mays; that Smith and Mays thereupon agreed with King that the latter should employ some one to circulate the petitions; that the persons so employed should be paid $4 a day, and King was to receive a half-section of school land for his services. We think that the evidence that the plaintiff in error had purchased school lands in the section of the country where the reserve was afterwards established was itself evidence tending to show that such reserve was in contemplation and the conspiracy being formed for that purpose. The scheme was not a new one, and there is not a particle of testimony that this school land in place had any other value than as a base for lieu land selections elsewhere; but to give them this value they had to be included within the boundaries of an established forest reserve. The evidence therefore tended to prove the formation of a conspiracy to defraud the United States out of lands of a greater value than those purchased by Jones from the state, but as these acts were committed more than three years before the finding of the indictment the evidence was not admissible to prove such overt acts as criminal offenses. They were, however, admissible and properly admitted to prove the intent and design and guilty knowledge of the defendant with respect to the scheme to defraud the United States charged in the indictment.

We see nothing in the fact that by an act of the Legislature of Oregon of February 27, 1901 (Gen. Laws 1901, p. 304), authorizing the board of commissioners for the sale of school lands to bid in certain lands sold under foreclosure of mortgage, there was a provision that all sales of land previously made by the board were ratified and confirmed. This provision would seem to indicate that it was known at that time that these sales were illegal and void, and this was an effort on the part of some one interested in the lands to give them a valid title under the law of the state, and, as far as the state is concerned, it may be conceded that it did so, but that did not relieve the defendant Jones of his fraudulent intent and purpose nor did it relieve the scheme of its fraudulent character as against the United States. The evidence was therefore properly admitted.

It is objected that the statute of limitations had run against the offense charged in the indictment because it appeared that the conspiracy was formed and overt acts were committed in furtherance thereof

more than three years prior to the finding of the indictment. This objection was considered by this court in Jones v. United States, 162 Fed. 417, 426, 89 C. C. A. 303, 312. It was there held that:

"Where the alleged conspiracy contemplated various overt acts, and the consequent continuance of the conspiracy beyond the commission of the first one, then each overt act gives a new, separate, and distinct effect to the conspiracy, and constitutes another crime."

Under this rule the overt acts alleged in the indictment and established by proof continued the conspiracy to the time within the statute of limitations.

It was objected that evidence was admitted tending to show that the defendant Mays had been engaged in a fraudulent and illegal acquisition of public lands in another part of the state and by a different method from that described in the indictment upon which the defendants were being tried. This evidence was admitted as bearing upon the question of the intent, purpose, and design of the defendant Mays as shown by his acts and doings of a kindred character—that is to say, with respect to his acts and doings in defrauding the United States of its public lands. This question was considered by this court in the case of Van Gesner v. United States, 153 Fed. 46, 55, 82 C. C. A. 180, 189, and the evidence held admissible. The question was also considered by the Supreme Court in the case of Williamson v. United States, 207 U. S. 425, 451, 28 Sup. Ct. 163, 52 L. Ed. 278, and the evidence held properly admitted.

The judgment of the Circuit Court is affirmed.