## JONES v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit.   May 10, 1920.)

No. 3312.

1. **Public lands ☞123—Damages for value of land recoverable for fraudulent entry, although proof was insufficient.**

Where defendant obtained patents for public lands through fraudulent entries made for his benefit by others, who swore falsely as to residence, cultivation, and the bona fides of their entries, the United States is not precluded from the recovery of damages for the value of the land, because, even if such testimony had been true, it would not as matter of law, have entitled the entrymen to patents which were issued through mistake of law by the Land Department.

2. **Public lands ☞123—Procuring fraudulent entries question for jury.**

Evidence *held* sufficient to require submission to the jury of the question whether homestead entries of public lands were fraudulently procured by defendant in whole or in part for his benefit.

3. **Evidence ☞135(1)—Of fraudulent entries other than those in issue admissible to show intent.**

In an action by the United States to recover the value of public lands alleged to have been secured by defendant through fraudulent entries by persons who had previously entered into contracts with defendant, evidence that defendant procured other illegal entries under similar contracts *held* admissible on the question of intent.

4. **Appeal and error ☞273(6)—Sufficiency of exceptions to instructions.**

To entitle a plaintiff in error to a review of instructions given, the exceptions taken thereto must have been sufficiently specific to direct the attention of the trial court to the particular error complained of.

In Error to the District Court of the United States for the District of Oregon; Charles E. Wolverton, Judge.

Action by the United States against Willard N. Jones. From the judgment, defendant brings error. Affirmed.

See, also, 242 Fed. 609, 155 C. C. A. 299.

Action at law by the United States to recover of the defendant, Willard N. Jones, damages for the value of certain public lands which it is charged he, through misrepresentation and fraud, induced the Land Department of the government to part with its title to and issue patents therefor to certain persons, claiming to be bona fide entrymen, but who were not such entrymen, and not entitled to receive such patents or the title to said lands.

John H. Hall and Jay Bowerman, both of Portland, Or., for plaintiff in error.

Bert E. Haney, U. S. Atty., and Barnett H. Goldstein, Asst. U. S. Atty., both of Portland, Or.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

MORROW, Circuit Judge. [1] This case is here for the second time. The statement of facts contained in the former opinion of this court sufficiently describes the pleadings. U. S. v. Jones, 242 Fed. 609, 155 C. C. A. 299. The former writ of error brought up the question whether the court below was correct in entering a judgment on the pleadings in favor of the defendant. The question there involved was stated by Judge Hunt, speaking for this court, as follows:

"The entries described in the complaint were made under an act of Congress (28 Stat. 286, 326) and the amendments thereto (31 Stat. 179, 740) requiring, among other things, that three years' actual residence on the land 'shall be established by such evidence as is now required in homestead proofs as a prerequisite to title or patent.' But the Land Department of the United States, acting under what is now conceded to have been a mistake of law, permitted eight of the entrymen to make proof of residences of from one to one and one-half years, respectively, and to deduct times of their respective military services from the required three-year period of residence. This error arose by applying to the entries upon lands within the Siletz reservation the provisions of sections 2304 and 2305, Revised Statutes (Comp. St. 1916, §§ 4592, 4593), and Act Jan. 26, 1901, c. 180 (31 Stat. 740), which relate to commutation of homestead entries made by honorably discharged Union soldiers."

The court then stated the question at issue in the case as follows:

"Inasmuch, then, as the requirements of the statute under which the proofs were taken and the patents issued could only have been properly met by proof of three years' actual residence on the land, the question arises: Is the United States precluded in this action from recovering damages although the entrymen in their final proofs did not say that they had actually resided on their lands for the required period of three years, yet did falsely swear that they had actually resided on the lands for certain times, though for less than the three years required; that they were making the entries for themselves when in fact they were making them for the benefit of the defendant, Jones; that they had made certain improvements which in fact they had not made; and that they had made their entries for the purpose of actual settlement and cultivation, when in fact they had not made them for those purposes?"

The court held that the United States was not precluded from recovering damages in this action for the lands conveyed in the patents to the entrymen therein named, notwithstanding the entrymen in their final proofs did not say that they had actually resided on their lands for the required period of three years. The court accordingly reversed the judgment of the trial court and upon the subsequent trial of the issues before a jury a verdict and judgment was entered in favor of the United States for the sum of $18,204.84.

The question involved in the former writ of error is again brought up for review upon an objection to the introduction of any evidence in support of the allegations of the complaint. The objection to such evidence is made upon the ground that the officers of the Land Department could not have been deceived to the extent that any of the

homestead claims had sufficiently complied with the laws of the United States to entitle them to final certificates and patents, and that the false representations and testimony given by them upon their final proofs, even if strictly true, would not entitle them to patents. To this objection we must reply as before, that—

"this contention would eliminate intentional misrepresentation and falsehood as to agreements of alienation and as to continuous residence for the time sworn to in the final proof and as to cultivation of the lands embraced within the entries and occupancy thereof for home purposes;" that "these several requirements cannot be looked upon as immaterial and irrelevant, because they are of the essence of the homestead law." U. S. v. Jones, 242 Fed. 614, 155 C. C. A. 304.

[2] It is next contended that the court should have granted defendant's motion for a nonsuit and for a directed verdict in favor of the defendant, for the reason that the testimony was insufficient to sustain the charge of misrepresentation and fraud on the part of the defendant, Jones, with respect to the entries and proof described in the complaint. It is admitted that the defendant entered into a written agreement with the nine prospective entrymen mentioned in the complaint with respect to these lands. This agreement provided in substance, among other things, that Jones could give to each of the entrymen information which would enable the latter to locate and file a homestead upon 160 acres of the public lands of the United States situated within the state of Oregon; that the entryman was to pay Jones a compensation for such services and information and for his services to be performed in the preparation of the papers and affidavits necessary in making such filing, the sum of $185; that the entryman should employ Jones to build a house upon the land to be taken as a homestead and to pay Jones therefor the sum of $100; that Jones would clear and cultivate the land to be taken up under the agreement, or so much thereof as was required, and for the time required by the laws of the United States in order to procure title thereto; that the entryman would pay therefor the sum of $175; that Jones would accept such employment and agree to do and perform, or cause to be performed, all the work and labor necessary to be done and performed upon said premises in order to comply with the laws of the United States; that Jones would advance to the entryman, if required, the amount of fees required at the land office in order to make and perfect such filing, and all necessary expenses of the entryman in connection therewith, not to exceed the sum of $60; that the entryman agreed to repay to Jones all sums advanced by him; that Jones, after final proof had been made upon the claim, would at the option of the entryman procure for the entryman a loan not to exceed the sum of $720 to be secured by a first mortgage upon the claim, and immediately upon the procurement of such loan all sums of money still to be paid to Jones by the entryman, together with all sums of money advanced by Jones to the entryman under the agreement, should become due and payable, and should be paid out of the loan so secured. It was further provided that, if the entryman did not avail himself of the loan mentioned, then all moneys advanced to the entryman by Jones under the agreement, together with

all sums of money agreed to be paid to Jones by the entryman should become due and payable as soon as final proof should have been made upon the claim.

The lands in controversy, the value of which the United States is seeking to recover from the defendant Jones, were formerly a part of the Siletz Indian reservation, in Lincoln county, in the state of Oregon. They were ceded to the United States by the Indians under an agreement dated October 31, 1892. They were opened to settle-ment and entry on July 25, 1895, under the homestead laws of the United States, by section 15 of the act of August 15, 1894 (Indian Appropriation Bill, 28 Stat. 286, 323, 326), and the proclamation of the President of the United States dated May 16, 1896 (29 Stat. 866). The act of August 15, 1894 provided, among other things, that—

"The mineral lands shall be disposed of under the laws applicable thereto, and the balance of the land so ceded shall be disposed of until further pro-vided by law under the townsite law and under the provisions of the home-stead law: Provided, however, that each settler, under and in accordance witn the provisions of said homestead laws shall, at the time of making his original entry, pay the sum of 50 cents per acre in addition to the fees now required by law, and at the time of making final proof shall pay the further sum of $1.00 per acre, nnal proof to be made within five years from the date of entry, and three years' actual residence on the land shall be established by such evidence as is now required in homestead proof, as a prerequisite to title or patent."

The law relating to homestead proof here referred to is found in sections 2290 and 2291 of the Revised Statutes of the United States (Comp. St. §§ 4531, 4532). In section 2290 it is provided that any person applying to enter land as a homestead shall make affidavit "that such application is honestly and in good faith made for the purpose of actual settlement and cultivation, and not for the benefit of any other person, * * * that he * * * does not apply to enter the same for the purpose of speculation, but in good faith to obtain a home for himself, * * * and that he * * * has not directly or indirectly made, and will not make, any agreement or contract in any way or manner, with any person * * * whatsoever, by which the title which he * * * might acquire from the government of the United States should inure, in whole or in part, to the benefit of any person, except himself," and in section 2291 it is provided that in making final proof by the en-tryman he shall prove by "two credible witnesses that he * * * has resided upon or cultivated the" homestead "for the term of three years immediately succeeding the time of filing the affidavit, and * * * that no part of such land has been alienated" ex-cept as provided in a preceding section not applicable here.

The act of August 15, 1894, required the homestead entryman to reside on the land for only three years, instead of five years, as then required by the general homestead law. With this single ex-ception, the homestead entryman was required to comply with all the provisions of the general homestead law. Under this law the question upon the trial was: Did the entrymen, in their applica-

tion to enter the land or upon final proof, make false representations in any of the particulars mentioned with intent to deceive and defraud the United States out of the title to such lands, and, if such false representations were made, were they made with the knowledge and solicitation of the defendant, Jones? The first inquiry is: Did the defendant, Jones, make an agreement or contract with the entrymen, or either of them, mentioned in the complaint, in any way or manner whereby the title the entryman might acquire from the government of the United States would inure in whole or in part to the benefit of the defendant, Jones?

A written agreement was made by the defendant, Jones, with each of the entrymen relating to this land. The agreements provided that Jones would give the entrymen information which would enable each of them to locate and file a homestead upon 160 acres of public lands. It does not appear from the evidence that these prospective entrymen were looking for homesteads, or indeed for land of any kind. On the contrary, Jones had employed an agent to look up the lands for him, and another agent was sent out to look up qualified entrymen to enter the lands. The agreement was to bind the entrymen to Jones in such a manner that, while it appeared upon its face to aid the entryman in acquiring a homestead for himself under the law, it was in fact an agreement in which that feature of the transaction might have a different complexion, and be made subordinate to the interest of Jones in a profitable transaction for himself in land or money, or possibly both. The agreement provided that, after final proof had been made by the entrymen, Jones, at the option of the entryman, would procure a loan, not to exceed the sum of $720 to be secured by a first mortgage upon the claims, and immediately upon the procurement of such a loan all sums of money advanced by Jones should become due and payable, and should be paid out of the loan so secured.

These advances to be made by Jones were set forth in the agreement and were for: (1) Information to be furnished by Jones which would enable the entryman to locate and file a homestead upon 160 acres of land and for affidavits necessary in making such filing, $185; (2) the building of a house upon the land by Jones, $100; (3) the clearing and cultivating of the land by Jones, $175; (4) the advance by Jones of the. fees to make and perfect the filing, $60—making a total of $520. After final proof, Jones was to procure a loan for each entryman for an amount not to exceed the sum of $720. Here was a difference of $200 between the advances to be made by Jones as provided for in the agreement and the amount of the loan. Manifestly this written agreement required scrutiny and careful inquiry into the facts and circumstances under which it was entered into and was to be carried out.

The defendant was a witness in his own behalf. He testified that he had heard about this land being taken on the Siletz, and he sent a Mr. Mead over to make an examination of it—to cruise it. The meaning of the term "cruise," as here used, is defined by the Standard Dictionary as:

"A report of a timber surveyor showing the character and amount of timber in a stand."

The land in controversy is timber land, and the purpose of the survey was therefore to ascertain its value as timber land, and not as agriculture land. The witness said he had in mind at that time to locate soldiers' widows on the land, and he had a contract prepared by a Mr. Potter, who, it appears, was a lawyer; that he went to see a Mr. Wells, to see if he (Wells) could secure the signatures of widows to these contracts. He went to Wells, because he was adjutant general of the G. A. R. of the state, and as such knew all, or a great many, of his comrades. After he had secured the signatures of 13 or 14 soldiers' widows, he ascertained that there were not very many more soldiers' widows who were eligible for claims. With respect to those that were secured, no houses were built on the claims, because it was thought it was not required; but the Interior Department decided that a soldier's widow had to identify herself with the land by some act of settlement. The result was all these widows' claims were canceled by the Secretary of the Interior; but the witness had already turned his attention to the ex-soldiers' claims in their own right, and he employed Mr. Wells to secure signatures to the claims of ex-soldiers, for which he paid Wells $5 each. The witness was asked whether these contracts "were prepared before the entrymen were secured." He answered:

"Why, yes, they were prepared; that was the first thing that was done, was to prepare the contracts, and those contracts in blank were given to Mr. Wells, and he brought them back to my office signed. There were very few, if any, of those entrymen that I ever saw at that time. They were signed, not in my presence, or not from any conversation that I had with him or with them, but the signatures were secured by Mr. Wells."

The witness testified that in accordance with the terms of the agreement he took a mortgage from each of the nine entrymen mentioned in the complaint for $720, except in one instance, where the entryman gave him a quitclaim deed. He acquired title after the patents had been issued to four of the claims. The title to the remaining five he did not get. He was not looking to the soldiers for the security. There was no individual security there. He did not expect to recover against the soldiers. He was looking to the land. He was asked if he expected the old soldiers to pay off the advances he had made to them. He answered that he hoped they would. He was asked where he thought they were going to get the money to pay them off. He replied that he supposed they would sell the land, like most homesteaders did.

J. L. Wells was a witness for the United States, and he testified that he was a member of the G. A. R.; that he had made a filing for himself, and entered into the contract with defendant, Jones, mentioned in the complaint. He also interviewed and secured contracts with the eight others described as entrymen in the complaint. He was asked, concerning his own entry, if he at any time had intended to file on the land as a home. He answered, "No; not exactly." He was asked if any of the others intended to file upon the

land as homes. He answered, "Not exactly, as he understood it." With respect to the Teghtmeier claim, the witness had made affidavit before the land office to the effect that the claimant and family made the homestead his continuous residence, except what time he had been off for a while; that the claimant was married, and his family resided with him. He was asked if that was true. He replied, "No; that it was not true." He testified that the claims were not taken up as homesteads; that he proved up his own claim by commuting the same; that commutation fee was furnished by Jones. After he got title to the land, he sold the same to Jones for $200. He was asked if that was the understanding he had in the beginning—that he was to do that. He answered, "That was the understanding." There is much more testimony of this character in the record. It was clearly sufficient to justify the court in denying defendant's motion for an instructed verdict in his favor.

[3] The defendant contends that the trial court erred in admitting in evidence the form of contract purporting to have been entered into between the defendant Jones and certain widows of deceased soldiers, and the evidence of witnesses to the effect that defendant had procured widows to file on lands in the Siletz reservation without settlement. That evidence was also admitted to show final proof, and oral testimony of a number of ex-soldiers who had contracted with the defendant in the same manner and form as had the nine settlers whose claims went to patent in this case. This evidence was admitted as tending to show with what intent and purpose the defendant acted with reference to the nine claims here involved, and for no other purpose, and the jury was so instructed by the court. The evidence was properly admitted. Jones v. U. S., 162 Fed. 417, 89 C. C. A. 303; Jones v. U. S., 179 Fed. 584, 103 C. C. A. 142; Hallowell v. U. S., 253 Fed. 865, 165 C. C. A. 345.

[4] The evidence as to the value of the timber land involved in this action was plainly admissible. We think the citation of authorities is unnecessary in support of that rule. The refusal of the court to give a requested instruction concerning the absence of wrongful intent is assigned as error. The instruction requested was fully covered by the instructions given by the court. It is urged that the court erred in giving an instruction relative to the matter of interest as an element, in the measure of damages. The objection to the instructions of the court was general. The exception was "to the refusal of the court to give the instruction requested by the defendant which were not given." In Hammond v. U. S., 246 Fed. 40, 158 C. C. A. 266, Judge Ross, speaking for this court, said:

"The rule is established by decisions almost innumerable that, to entitle an appellant to call in question instructions given by a trial court to the jury, the exception or exceptions taken thereto must be sufficiently specific to direct the attention of the court to the particular error or errors complained of, to the end that the court may correct the error, should one be found to exist, before the retirement of the jury."

Finding no error in the record, the judgment of the District Court is affirmed.