TAYLOR *v.* WARD.

1. VENDOR AND PURCHASER—RESCISSION—FRAUD—EVIDENCE—SUFFICIENCY.

In suit by vendors for rescission of land contract on ground that it was entered into in reliance upon vendees' promise to use condemnation money to be received by them for part of property to erect building on remaining portion, evidence *held,* insufficient to establish such promise.

2. EVIDENCE—VENDOR AND PURCHASER—FRAUD.

Statements made by vendees after contract was executed may not be considered as inducement for vendors to sign.

3. VENDOR AND PURCHASER—FRAUD—PROMISES—INTENT.

Even if vendees promised to use condemnation money to erect building on land purchased and failed to do so, vendors would not be entitled to rescind contract on that ground, in absence of showing when building was to be erected, or that vendees had present intention not to keep said promise when made.

4. EVIDENCE—PRIOR MATERIAL NEGOTIATIONS MERGED IN WRITTEN CONTRACT.

Material negotiations preceding execution of contract are merged therein and are inadmissible in evidence to change or vary its terms.

5. BROKERS—PRINCIPAL AND AGENT—WHEN BROKER MAY BECOME PURCHASER.

Agent authorized to sell at stated price and entitled to receive all he can get over that price for his services in making sale, may indirectly become purchaser himself without disclosing that fact to principal.

6. SAME—DUTY TO DISCLOSE INTEREST.

Agent clothed with discretionary power to make best deal possible may not purchase for himself or collect double commission without full disclosure to principal.

7. SAME—VENDOR AND PURCHASER—WAIVER.

Vendors, by consummating sale of property after being informed that broker was participating in its purchase, waived right of objection to his alleged misconduct in that regard.

8. SAME—EQUITY—ESTOPPEL.

It would be inequitable to grant vendors equitable relief on ground of broker's alleged misconduct in participating in purchase, where they had knowledge thereof, remained silent, and accepted payments for almost three years.

9. FRAUD—EVIDENCE.

Wider latitude is allowed in admission of testimony where existence of fraud is issue, but such testimony must have legitimate bearing on case.

10. SAME—EVIDENCE OF SIMILAR TRANSACTIONS.

To show intent to defraud, or knowledge by defendant of falseness of representations, evidence of similar transactions made just prior to or at about same time as one in question, in which defendant made similar representations, is admissible.

11. VENDOR AND PURCHASER—FRAUD—EVIDENCE.

In suit by vendors for rescission of land contract on ground of fraud, copy of earlier contract with another purchaser, never consummated, was admissible solely for purpose of minimizing likelihood that vendees made fraudulent representations to induce contract more favorable to vendors than one they had been willing to make short time previously.

Appeal from Wayne; Sample (George W.), J., presiding. Submitted April 7, 1933. (Docket No. 45, Calendar No. 37,093.) Decided June 29, 1933.

Bill by Cecil F. Taylor and another against Harold B. Ward and another for rescission of a land contract and for an accounting. Decree for plaintiffs. Defendants appeal. Reversed.

*S. Reymont Paul* and *William H. Kaplan,* for plaintiffs.

*Claude H. Stevens* (*Berry & Stevens* and *Pelton & McGee,* of counsel), for defendant Ward.

*Benjamin S. Pagel,* for defendant Dumas.

Butzel, J. Cecil F. Taylor and wife are the owners of a very substantial equity in property at the northeast corner of Livernois avenue and Six Mile road in the city of Detroit. They purchased it on contract from Henry Diehr, the owner of the fee, in July, 1924, when the property had a frontage of 62 feet on Six Mile road and 100 feet on Livernois avenue. Condemnation proceedings were begun by the city of Detroit on February 28, 1927, for the purpose of widening Livernois avenue. The city sought to take a 27-foot strip off the Six Mile frontage of the Taylor lot and thus leave a parcel. with a frontage of 100 feet on Livernois avenue and of 35 feet on Six Mile road. A jury was impaneled on May 16, 1927, long before negotiations for the sale of the Taylor equity were begun, a tentative agreement was arrived at between the Taylors and the city, fixing the value of the 27 feet sought at $27,835.90, and an award was made accordingly by a jury verdict rendered in May, 1929. A part of the 35 feet remaining was leased to a restaurant and another portion thereof was occupied by a gas station.

A short time prior to November 24, 1928, the Taylors entered into a written preliminary agree-

ment for the sale of the entire parcel to a drug company for $58,000, with a down payment of $10,000 and monthly payments of at least $300, including interest at the rate of 6 per cent. per annum, until the purchase price was paid. It further provided that the purchaser was to receive the Livernois condemnation award. The sale to the drug company was never consummated.

There were two leases on the property, one dated October 24, 1928, for a term of five years, with a privilege of cancellation at the end of two years in case of sale of the property, conditioned upon indemnification of the lessee for any damages up to $2,500; the other for a term of two years from the first day of August, 1928.

Defendant Harvey B. Dumas, a real estate dealer and president of the Livernois Improvement Association, heard of the proposed deal with the drug company, and, after it fell through, requested the right to sell the property. Dumas claims that on November 24, 1928, Taylor signed a listing card form giving Dumas the exclusive sale of the property for five days, at a price of $58,000, $10,000 to be paid down, the balance at the rate of $350 per month with interest, the total amount to be paid within two years. It also provided that Dumas was to receive a commission of $1,740 and everything obtained over $58,000; that any sale was to be made subject to the two leases hereinbefore mentioned; that the property was to be sold free from incumbrances, except "widening condemnation awards for which owner agrees to pay to purchaser." A purported copy of the listing card was introduced in evidence, signed by Dumas alone, who testified that it was an exact duplicate of a form signed by Taylor. Dumas claimed that he had kept the dupli-

cate but destroyed it after the deal was consummated. The card introduced in evidence was produced from the files of Laverne Courtney, Taylor's legal representative in the transaction. Taylor admitted that it was a copy of the agreement he had given Dumas, although he could not remember signing it.

Dumas interested defendant Harold B. Ward in the property. Ward was cashier of the Peninsular State Bank of Highland Park and occupied a high place in civic and other communal affairs, which seems to indicate that he was a man of position and character. Taylor claims that Dumas first represented to him that the property was being purchased by the bank itself for the erection of a building, but he admits that when he was told that the bank was not the purchaser he made no objection to a sale to Ward.

A memorandum agreement was executed and signed by plaintiffs. The parties met in the offices of the Peninsular State Bank of Highland Park on November 28, 1928, together with attorneys for both vendors and purchaser. The usual form of land contract was executed as drafted. It substantially embodied almost all of the terms contained in the authorization given to Dumas for the sale of the property and in the earlier memorandum agreement, with the exception of the commission. The vendee took possession subject to the two outstanding leases, which he assumed. The contract provided that the vendee was entitled to any award made in the condemnation proceedings, but that he was to pay all street widening assessments and taxes levied against the property thereafter. The purchaser was also to pay plaintiffs' costs and attorney fees in the condemnation proceedings.

It is claimed by defendants and denied by plaintiffs that, on December 15, 1928, the date set for the down payment and consummation of the deal, Dumas stated that he desired to acquire an interest in the property and borrowed $500 of the down payment from the Taylors for that very purpose. Courtney, the attorney who represented plaintiffs, corroborated the testimony of Dumas and Ward on this point, while Taylor testified that the loan was requested so that Dumas in turn might loan the money to Ward, to enable him to complete the deal.

Within 10 days after the contract was entered into between plaintiffs and Ward, defendant Ward executed an option to Dumas, entitling the latter to acquire one-half of the vendee's interest in the contract. This option was exercised on December 15, 1928, and was the occasion for the $500 loan made to Dumas. Payments were made regularly for a considerable period. The proceedings in the condemnation suit were concluded on May 9, 1929, and the jury's verdict was confirmed on the 11th day of the following month. The sum of $27,835.90 was allowed for the 27 feet appropriated by the city. This amount, less $644.62 for attorney fees, was paid to Ward and divided between Ward and Dumas as owners of half interests, after a deduction of $3,500. After the preliminary contract was executed and just prior to the consummation of the deal on December 15th, Taylor and Dumas went to see Diehr, the owner of the fee, who agreed to be satisfied if $3,500 of the award was applied on his contract with Taylor, as his share in the condemnation award.

In December, 1929, Ward told plaintiffs that he was unable to continue with the contract owing to financial reverses. At that time, all payments and

taxes then due had been paid. Plaintiffs not only consented to an assignment of Ward's interest to Dumas but also gave Ward a written memorandum releasing him from all further liability under the contract. Plaintiffs also gave Dumas an extension of three additional years in which to pay the balance of the contract, conditioned upon his paying $1,000 on the contract and $3,000 more on or before November 1, 1930. Payments were kept up by Dumas with a fair degree of regularity for over a year. He paid the $1,000 necessary to secure an extension on the contract and also sums aggregating $1,400, or thereabouts, in addition to the regular monthly payments of $350 provided for by the contract. However, after January, 1931, he became irregular in the amounts of his monthly remittances. The assessment against the property for the widening of Livernois avenue had not been levied at the time of the trial. It is estimated that it will run into a large amount.

In October, 1931, Dumas asked plaintiffs for a large discount on the balance due them in consideration of a cash settlement. They became indignant, consulted counsel, and on October 31, 1931, filed their bill of complaint against Ward and Dumas, claiming rescission on the ground that the contract was entered into in reliance upon a promise that the condemnation money was to be used to erect a building on the premises, in order that plaintiffs might be paid the balance due from the proceeds of a mortgage to be placed on the property when thus improved; that defendants had no present intention of keeping such promise when made; that they have kept the award money, with the result that plaintiffs not only have lost a part of their property through condemnation, but also a large sum in excess of the amounts paid to them.

The contract itself is so unusual and unbusiness-like that the transaction challenges the closest scrutiny. We are constrained, however, to follow well-known principles of law and hold that plaintiffs are not entitled to the relief given them by the trial judge, who decreed rescission of the contract and payment of the sum of $13,443.73 to plaintiffs.

There is much controverted testimony as to whether Ward and Dumas ever made any promises to erect a building with the money received from the award. Taylor is the only one who testified to any such statement coming directly from Ward. He is contradicted by both defendants. There seems to be little doubt that Dumas did discuss the possibility of erecting a building in a general way. Taylor, the plaintiff, and also his former stenographer, testified that he had made such representations before the preliminary agreement had been signed. Diehr, the owner of the fee, and his daughter also testified that Dumas had made statements to that effect after the contract had been entered into, but, except as having a tendency to corroborate Taylor, these statements are immaterial. The declarations made to them cannot be considered as an induce-ment to the contract, inasmuch as they were made after signing the contract.

What seems especially significant is the testimony of Courtney, Taylor's attorney in the transaction. He must be regarded as a disinterested witness, if not one prejudiced in Taylor's favor. Yet, not one word appears in either Taylor's or Courtney's tes-timony to indicate that there was any discussion between the two of them with regard to the erection of a building, although Courtney was commissioned either to draw up or examine the land contract. In the ordinary course of events a client would discuss all important provisions to be embodied in a con-

tract with his attorney. Taylor testified that Courtney drew the contract. Ward also had an able attorney looking after his interests. Both attorneys testified that they heard no mention of the erection of a building at any of the meetings arranged to close the deal. Neither do the land contract, the assignments and releases, nor any of the other numerous documents drawn up in connection with the deal contain any hint of the obligation to erect a building.

If the award money was to be used for the construction of a building, when was it to be erected? The contract provided that the property was taken subject to two leases, one of which had 19 months, and the other almost two years and possibly a longer period, to run. No building operations could be begun prior to their expiration or cancellation. A consideration of this fact, together with the clause providing for full payment of the balance due within two years, indicates that there was no advantage to be gained from a promise to build which could not be carried out until the time for full payment had almost expired. It may be argued that a cancellation of the leases could possibly have been arranged, yet nothing appears in the record to indicate that such an arrangement was even discussed between the parties. The terms of the written contract are inconsistent with the contentions of plaintiffs.

Even assuming that plaintiffs' allegations were correct, there is no showing of a present intention not to keep the promise at the time it was made. Both plaintiffs and Ward were represented by counsel, and we regard it as significant that neither of them were told that the erection of the building was an important element of the contract, nor anything

said in their presence with regard to the application of the condemnation money.

We are unable to see just what actuated plaintiffs in making what proved to be a foolish deal. Of course, the Livernois avenue widening condemnation suit had been pending for a number of years. There was no certainty as to when, if at all, the jury would bring in a verdict of necessity and award damages as stipulated. Plaintiffs had been paying on the contract for over four years. The temptation to sell at a large profit and at once realize the sum of $10,000 less the real estate commission, may have been the inducement to make the contract. In any event, plaintiffs were primarily interested in the payment of the balance due and not in the means by which the money would be obtained by defendants. It could matter little to plaintiffs whether a building was erected on the property, or not, provided they were paid, especially in view of the fact that no building could be placed on the property before the time set for completion of the payments had almost expired. It is significant that when plaintiffs released Ward, and gave Dumas an extension of an additional three years in which to pay the balance due them, nothing again was put in writing with regard to the erection of a building or the disposition of the money received through the condemnation.

Even assuming that plaintiffs' claims are correct, at most they were promises made contemporaneously with the execution of the contract. Plaintiffs claim that they were material negotiations that preceded the execution of the written instrument. Such negotiations, if material, cannot be admitted in evidence in order to change or vary the terms of a contract. They are merged therein. See *Boston Piano & Music Co.* v. *Pontiac Clothing Co.*, 199

Mich. 141, 146; *J. B. Colt Co.* v. *Cousino,* 226 Mich. 518.  Neither can plaintiffs claim relief by alleging that they were induced to enter into the contract by defendants' representations that a building would be erected with the award money.  In the absence of proof that defendants had no intention to keep their promises, if and when made, plaintiffs cannot claim rescission or damages for fraud.  *Boston Piano & Music Co.* v. *Pontiac Clothing Co., supra; Dobson* v. *Whitker,* 242 Mich. 308; *Danto* v. *Charles C. Robbins, Inc.,* 250 Mich. 419.

Plaintiffs claim that Dumas was their agent and that his undisclosed purchase of an interest in the property prior to the consummation of the deal on December 15, 1928, constituted a breach of duty. The evidence really indicates that Dumas was a broker, entitled to all sums over $58,000 in addition to his commission.  In *Palmer* v. *Shank Fireproof Storage Co.,* 237 Mich. 627, the law is stated as follows:

"Where an agent is authorized to sell at a stated price, and is entitled to receive all that he can get over that price for his services in making the sale, he may indirectly become the purchaser himself without disclosing that fact to the principal."

See *Ranney* v. *Donovan,* 78 Mich. 318; *Montross* v. *Eddy,* 94 Mich. 100 (34 Am. St. Rep. 323); *Hutton* v. *Sherrard,* 183 Mich. 356 (L. R. A. 1915 E, 976); *Trost* v. *J. E. St. Clair Co.,* 250 Mich. 342.  It is true that an agent, clothed with discretionary powers to make the best deal possible, cannot purchase for himself or collect a double commission without a full disclosure to his principal.  *Humphrey* v. *Eddy Transportation Co.,* 107 Mich. 163.  Even if we accept plaintiffs' theory that Dumas was such an agent, the Taylors waived their privilege of objection to the alleged misconduct of Dumas by going through with the deal on December 15, 1928, after

they had been informed of Dumas' arrangements to purchase an interest. It would be inequitable to grant equitable relief to plaintiffs after they remained silent and accepted payments for almost three years. See *Humphrey* v. *Eddy Transportation Co.*, 115 Mich. 420; *Marsh* v. *Whitmore*, 21 Wall. (88 U. S.) 178; *Bassett* v. *Brown*, 105 Mass. 551; *Bartleson* v. *Vanderhoff*, 96 Minn. 184 (104 N. W. 820).

The court refused to permit a copy of plaintiffs' earlier contract with the drug company to be introduced in evidence. There is no question but that this evidence was not admissible for the purpose of contradicting or altering the contract in the instant case. Plaintiffs claim rescission on the ground of fraud, however. A wider latitude is allowed in the admission of testimony when the existence of a fraud is an issue (*Gumberg* v. *Treusch*, 103 Mich. 543), subject to the natural limitation that such testimony must have some legitimate bearing upon the case. *Lewis* v. *Whitney*, 238 Mich. 74.

In *Ross* v. *Miner*, 64 Mich. 204, 206, this court said:

"But it is quite possible that fraud can be made out by proof of subsequent acts throwing light on what was done before the dealings assailed."

Again in *Krolik* v. *Lang*, 187 Mich. 286, 291, we said:

"It is an elementary rule that much latitude may be allowed in admission of circumstantial evidence in cases where fraud is charged * * * 'and no rigid rule of evidence can be applied to measure the admissibility of circumstances, for they arise out of the condition, relation, conduct, and declarations of the parties, and those are infinitely diversified.'"

To show intent to defraud, or the knowledge by defendant of the falseness of representations, we

have permitted evidence of similar transactions made just prior to or at about the same time as the one in question, in which defendant made similar representations. *J. B. Millet Co.* v. *Andrews,* 175 Mich. 350; *Jacobs* v. *Queen Insurance Co.,* 183 Mich. 512. See, also, *Jones* v. *United States* (C. C. A.), 265 Fed. 235; *Loftus* v. *Sturgis* (Tex. Civ. App.), 167 S. W. 14. In the case of *Janiszewski* v. *Shank,* 230 Mich. 189, the court permitted the introduction of a written sales agreement entered into prior to the contract sought to be rescinded, as relevant evidence tending to refute the claim that fraud was used to obtain a later contract embodying the identical consideration and terms included in the sales agreement.

The contract made with the drug company, although in no way indicative of the terms of the contract with defendants, nor conclusive as to what representations were made to the plaintiffs, is relevant, in so far as it has a tendency to minimize the likelihood that defendants made the fraudulent representations alleged to induce a contract more favorable to plaintiffs than one they had been willing to make but a short time previous. We believe that the contract was admissible solely for this purpose and no other.

Ward has been released from all liability on the contract by plaintiffs. Dumas still remains personally liable, and legal steps may be taken by plaintiffs to secure the return of the property. If they proceed in equity, a deficiency decree may be ordered, if necessary.

The bill will be dismissed. The decree of the lower court is reversed, with costs to defendants.

McDonald, C. J., and Clark, Potter, Sharpe, North, Fead, and Wiest, JJ., concurred.