RICHARDSON *v.* BALL.

1. DEEDS—CONSIDERATION—FINDING OF COURT.

In suit to set aside warranty deed executed by plaintiffs' mother, now deceased, to defendant who, after having been married to decedent's brother-in-law for eight months, was divorced from him and obtained $3,500 in a property settlement, record *held*, to support trial judge's finding that alleged deed was without actual consideration.

2. SAME—EXECUTION—MENTAL COMPETENCY—DIABETES—ARTERIO-SCLEROSIS—WEAKENED MENTAL CONDITION.

Weakened mental condition due to diabetes, arteriosclerosis, or other physical incapacity does not alone establish mental incompetency to execute a deed.

3. SAME—EXECUTION—UNDUE INFLUENCE—OPPORTUNITY.

Mere opportunity and desire does not sufficiently prove undue influence in the execution of a deed.

4. SAME—FRAUD—EVIDENCE.

In suit by grantor's heirs, commenced a fortnight after learning of deed to defendant who had been married for eight months to their uncle and had obtained $3,500 from him on a property settlement incident to divorce, to set aside warranty deed found to have been executed without actual consideration, record showing that elderly, diabetic grantor had thought she was witnessing papers relating to grantee's property elsewhere *held*, to support plaintiffs' allegation that deed was obtained by fraud and deceit.

5. FRAUD—BURDEN OF PROOF.

The burden of showing fraud is upon the person alleging it.

6. SAME—PRESUMPTIONS—INFERENCES.

Fraud is never presumed nor lightly inferred.

7. SAME—CIRCUMSTANTIAL EVIDENCE.

Fraud need not be shown by direct proof but may be proven by inference from facts and circumstances.

8. SAME—ADMISSION OF TESTIMONY.

A wide latitude is allowed in the admission of testimony where the existence of fraud is an issue.

Fraud and misrepresentation, see Restatement, Restitution, § 8.
Wrongful acquisition of title, see Restatement, Restitution, § 130.
Conveyances induced by mistake, see Restatement, Restitution, § 163.

9. EQUITY—ORDER OF PROOF—DISCRETION OF COURT.

> The order in which testimony may be received in equity cases rests largely in the discretion of the court.

10. APPEAL AND ERROR—DEEDS—CONSIDERATION—EVIDENCE.

> In suit by grantor's heirs to set aside warranty deed to defendant on the ground of grantor's mental incompetence and undue influence, fraud, and deceit on part of grantee in securing same, objection to reception of testimony concerning consideration or lack of it from defendant, called for cross-examination under the statute, *held*, without merit (3 Comp. Laws 1929, § 14220).

11. SAME—DEEDS—EXECUTION—MENTAL COMPETENCY—UNDUE INFLUENCE—EVIDENCE.

> Reception of testimony on question of mental competency of grantor in warranty deed was without error in suit to set aside deed by grantor's heirs on grounds of mental incompetence on part of grantor and undue influence, fraud, and deceit upon part of defendant grantee where questions of mental competency and undue influence do not control the result.

12. CANCELLATION OF INSTRUMENTS—EVIDENCE.

> In suit by heirs of grantor in an alleged warranty deed of 80-acre homestead farm against grantee to have same set aside where record shows mind of grantor, upwards of 60 years of age, was weakened by disease, that defendant exercised influence over her, that deed was without consideration, that defendant's testimony lacked probative value and that execution was induced by fraud and deceit of defendant, equity has inherent jurisdiction to, and does, decree cancellation of the deed.

Appeal from St. Clair; George (Fred W.), J. Submitted January 8, 1942. (Docket No. 51, Calendar No. 41,858.) Decided February 11, 1942. Rehearing denied March 17, 1942.

Bill by Laylon Richardson and others against Beatrice T. Ball to set aside a deed. Decree for plaintiffs. Defendant appeals. Affirmed.

*Watson & Inman,* for plaintiffs.

*Octavio Perez Guerra,* for defendant.

Boyles, J. Plaintiffs are the three children and heirs-at-law of one Sakie Richardson, deceased. The bill of complaint is filed to set aside a conveyance of real property on the grounds of mental incompetence of the grantor (plaintiffs' decedent), and undue influence, fraud, and deceit of the defendant in securing the same. The circuit judge set aside the conveyance, and the defendant grantee appeals.

Sam Richardson and wife, Sakie Richardson, were owners of an 80-acre farm homestead in St. Clair county as tenants by the entirety. Mr. Richardson died January 15, 1940, at an advanced age. Mrs. Richardson, then past 60 years of age, continued to live on the farm. About nine months (October 8, 1940) after her husband's death, Mrs. Richardson is alleged to have executed a warranty deed of the farm property to the defendant Beatrice T. Ball. Mrs. Richardson died in Florida, January 1, 1941, while on a pleasure trip. Defendant caused the deed to be recorded on January 6, 1941; plaintiffs first learned of this deed on January 13th, and filed a bill of complaint to set it aside on January 28th.

During the last year of her life, Mrs. Richardson suffered from diabetes and arteriosclerosis. Although insulin treatment was prescribed by a physician, she was not a cooperative patient, refused to continue the treatment or the diet prescribed for her, and her condition gradually grew worse. Her memory became bad, she misinterpreted things said to her, became childish at times, refused to listen to her children's suggestions and advice, and often talked about dying. The physician who treated her testified that she was as much of a mental case as she was a diabetic, that the deterioration of the mental faculties was very marked in her case, and

that because of her condition she would be a person who would be very easily led to do things.

Defendant became acquainted with Sam and Sakie Richardson in 1935 while operating a beauty shop in Brown City; her husband had a poolroom in the same town. After Mr. Ball died in 1936, defendant married one Frank Richardson, then nearly 70 years of age, a brother of Sam Richardson. Eight months later defendant divorced Frank, obtaining $3,500 in a property settlement. Defendant's friendship with Sam and Sakie Richardson was not resumed until December, 1939, at which time defendant called at their farm home during the last illness of Mr. Richardson. After his death, Mrs. Richardson and the defendant were frequently together. The defendant, whose home was in Flint, became a frequent caller at the farm home. Often she came in the company of a physician friend who sometimes arrived at the farm in an intoxicated condition. They brought intoxicating liquor to the farm and there were some drinking parties there to which Mrs. Richardson's children and friends strenuously objected. Due to her condition, a half glass of beer would incapacitate Mrs. Richardson. Her friends and neighbors, as well as her children, admonished Mrs. Richardson against her growing friendship with the defendant, and Mrs. Richardson at one time forbade the defendant bringing her doctor friend to the farm home again. However, he shortly thereafter again appeared with the defendant and was allowed to come in. The drinking parties continued. Part of the time Mrs. Richardson was ill in bed, although she continued to go about frequently in company with the defendant. Mrs. Richardson had a driver's license and often drove her own car.

Early in the year 1940 the defendant began discussing with Mrs. Richardson about selling the

farm. Late in the afternoon of October 8, 1940, the defendant and Mrs. Richardson went to the office of an attorney in Port Huron and the warranty deed in question was there signed, witnessed, acknowledged, and delivered to the defendant. Plaintiffs claim that Mrs. Richardson was told she was *witnessing* a paper for the defendant, had no intention of deeding the farm and did not so understand the transaction.

Defendant claims the circumstances were as follows: That after Sam's death, defendant approached Sakie about selling the farm, that there were several discussions about the subject and on September 17th Mrs. Richardson asked defendant $3,500 for the farm, that defendant made an offer of $3,000 which Mrs. Richardson accepted. The defendant, called by plaintiffs for cross-examination under the statute,[*] testified that on October 8, 1940, they went to the First National bank in Port Huron, that she got a draft or check for $1,920 and interest, that they went to Mr. Guerra's office where the deed was executed. She testified:

"*A*.  *  *  * I paid her for the deed then and there in Mr. Guerra's office. I paid her in currency, in cash.

"*Q*. Right across the desk?

"*A*. In the chairs at the desk.

"*Q*. Mr. Guerra was there?

"*A*. He was present, yes.

"*Q*. You counted out, how much did you give her?

"*A*. $1,950.

"*Q*. In Mr. Guerra's office on the 8th day of October?

"*A*. Yes.

"*Q*. How were those bills and what kind of bills?

---

* See 3 Comp. Laws 1929, § 14220 (Stat. Ann. § 27.915).—Reporter.

"*A.*   They were mixed bills.
"*Q.*   Quite a wad of them?
"*A.*   Yes, quite a stack of money."

She admitted she had no one examine an abstract, told no one about the transaction until after Mrs. Richardson's death; claimed that the balance of the purchase price ($3,000 less the $1,950 cash, referred to by her as $950) was paid by returning to Mrs. Richardson a note for $897 and interest, claimed to have been given her by the Richardsons; that it had been given for small loans made to them by her beginning in 1936.   The balance of the difference ($100) was unexplained.   The attorney, Mr. Guerra, is defendant's counsel on this appeal.   He was called by plaintiffs as their witness, and testified that he acted as witness and notary public in the execution of the warranty deed; professed to remember nothing more about the transaction except he did not recall that any money was paid over his desk in his presence as testified to by defendant.

Defendant's testimony that she paid actual consideration for the conveyance is not corroborated by any other testimony in the record.   The trial court analyzed the testimony at length and found that no consideration was paid by the defendant for the claimed conveyance.   With that conclusion we are in accord.   Defendant's claim is disputed in every material detail by disinterested witnesses and refuted by the circumstances.   It is not probable that the attorney who prepared the alleged conveyance and took the acknowledgment would not recall, in the space of less than a year afterward, that $1,950 had been paid in bills across his desk and a promissory note surrendered up, *if it had occurred.* There is evidence of contradictory statements made by defendant that she paid this money at a different time and a different place, and in a different man-

ner.    Defendant's money was invested in Flint
property and her income as a beauty culturist was
not such that she would be making unsecured loans
amounting to $900, or carrying around with her
cash to the amount of $1,950, as claimed by her.
Her total income for a year was approximately
$1,000.   Testimony from the bank established that
defendant did not get any draft or money from the
bank as claimed.   There was evidence that from
1936 until the death of Mrs. Richardson, neither
Mrs. Richardson nor her husband had, or paid out,
any such sum of money.   While they kept a check-
ing account, it was far more modest and the maxi-
mum balance was $350.   They bought a car, paid
for in instalments.   They received an annuity check
from insurance, used it to pay the balance on the
car, but defendant makes no claim of asking for
repayment of loans at any time.   There was testi-
mony that Mrs. Richardson valued 40 acres of the
farm at $3,000, yet defendant claims Mrs. Richard-
son deeded her the entire 80 acres for that sum.
The record supports the conclusion that the alleged
deed was without actual consideration.

The circuit judge found that Mrs. Richardson
was not mentally competent to execute the alleged
conveyance and that the same was procured by
undue influence.   To say the least, it is doubtful if
the record supports that conclusion.

Under the decisions of this court, what must be
shown to establish mental incompetence or undue
influence is well-settled law.   Weakened mental con-
dition due to diabetes, arteriosclerosis, or other
physical incapacity does not establish mental incom-
petence.   In December, 1940—about two months
after the transaction of October 8th—Mrs. Richard-
son went on a trip to Florida with a long-time friend,
drove her own car for six days on the trip.   The

record is not convincing that Mrs. Richardson was mentally incompetent or that this warranty deed executed on October 8th was the result of undue influence on the part of defendant. Mere opportunity and desire does not sufficiently prove undue influence. However, under our view of the case, the question of mental incompetence or undue influence does not control the result.

The record sustains plaintiffs' allegation that this conveyance was obtained by fraud and deceit. A number of witnesses testified that on many occasions both before and after October 8, 1940, Mrs. Richardson told them she had no intention of selling the farm. One of her sons lived on an adjoining farm and worked her farm on shares after her husband's death. She frequently discussed business matters with him. In December, 1940, before she started on the trip to Florida, she discussed with him what to do with the farm. She said she wanted to avoid probating and the expense, that she realized the hazards of the trip to Florida, that she might not survive. On December 14, 1940, she made and executed a voluntary deed of conveyance of the farm to her three children, plaintiffs herein, placed the same in escrow to be delivered after her death. This deed was recorded after her death. A disinterested witness testified to what Mrs. Richardson said about the occurrence in Mr. Guerra's office on October 8, 1940, as follows:

"*A.* Well, she said she didn't know, she had been to Port Huron with Mrs. Ball and signed a paper as a witness and she didn't tell me what it was. I, asked her if she knew what she was signing and she said, no, Bee [Mrs. Ball] was a friend of hers and she signed it. * * *

"*Q.* Just give us the conversation as near as you can.

"*A.* Nothing, only she had been to Port Huron here and been to a lawyer's office and signed this paper as a witness.

"*Q.* What else?

"*A.* Well, I don't know, there isn't anything else, she didn't know what it was, she was terribly worried, she didn't know what it was.

"*Q.* She said she had signed a paper as a witness?

"*A.* I said, don't you read what you sign and she said, Bee was a friend of mine.

"*Q.* You asked her if she read everything?

"*A.* She said, no, she didn't.

"*Q.* Bee was a friend of hers?

"*A.* That is what she told me.

"*Q.* This was the 25th of October?

"*A.* 27th, following Sunday.

"*Q.* Did any further conversation take place there with reference to Bee?

"*A.* The only time the sale of the farm was discussed was when Bee told me. Mrs. Richardson never said a word to me. On Friday the 25th, I asked Mrs. Richardson if she wanted to sell the farm, and she said no, that was the only home she had, and if she sold it what would she have."

This disinterested witness testified without objection as follows:

"*A.*  * * * I had a conversation with Mrs. Richardson on the 25th day of October at her home. I went there and found my mother and asked Mrs. Richardson to come home with me. I can't remember all of the conversation that happened that day. I had the conversation with Mrs. Richardson about the papers she signed on October 27th. She was at my home.

"*Q.* What happened?

"*A.* I told her Mrs. Ball wasn't a friend of hers.

"*Q.*   You told her Mrs. Ball wasn't a friend of hers?

"*A.*   Yes.

"*Q.*   On what did you base that?

"*A.*   What Mrs. Ball told me the previous Sunday.

"*Q.*   Go ahead with the conversation between you and Mrs. Richardson.

"*A.*   She said she thought Mrs. Ball was a friend of hers and went down to Port Huron and signed a paper which she was very worried about.   She signed this paper as a witness and didn't know what it was and I asked her if she didn't read it and she said, no.

"*Q.*   What is the conversation had about that?

"*A.*   I told her she was a fool."

Another disinterested witness testified without objection:

"*A.*   One thing she told me a few days she had been down there, she was down here with Bee, Mrs. Ball, and signed a paper for her and was worrying about it and Bee told her it was a deed.

"She didn't say what she thought it was, thought it might be concerning the property over at Flint that Mrs. Ball bought.   That was the next week after they were down there."

On cross-examination by Mr. Guerra, this witness testified:

"*Q.*   She told you before she went to Florida she had signed some papers for Mrs. Ball and she was afraid and she didn't know what she had signed, is that right?

"*A.*   Yes, sir."

The wife of one of the plaintiffs, who visited with Mrs. Richardson and Mrs. Ball on October 8, 1940,

the day the alleged deed was executed, testified as follows:

"I recall a visit Mrs. Ball and Mrs. Richardson paid me in my home in Port Huron on October 8, 1940. I kept a diary last year and put the date in my diary. They came to my home at about 4 o'clock in the afternoon. They didn't say anything about going to a lawyer's office. They talked about arranging papers in regard to Mrs. Ball's purchase of the apartment building in Flint. Mrs. Ball was stating that she thought this apartment building was a good investment and I understood they had been to the bank to arrange the purchase of it. They were doing their business together as I understood it. Mrs. Richardson and she came together. Mrs. Ball was on business, but Mrs. Richardson was not. She didn't discuss with me that day about signing any papers. About three days before, it was on Sunday, my husband and I were out there and Mrs. Richardson told me Mrs. Ball wanted her to witness some papers for her, and she didn't know what they were. This was about two days before this business on the 8th."

On cross-examination, the same witness said:

"Q. * * * Will you tell me what transpired on that day, what was the conversation, I am talking about the 8th of October, 1940?

"A. They just seemed to be rather interested about the investment that Mrs. Ball was about to make.

"Q. Who was interested, Mrs. Ball or Mrs. Richardson?

"A. Mrs. Ball mostly, because it was her investment.

"Q. She told you she was going to make this investment?

"A. Yes."

Conceding that the burden of showing fraud is

upon the person alleging it, and it is never presumed nor lightly inferred, fraud need not be shown by direct proof but may be proven by inference from facts and circumstances. *Detroit Trust Co.* v. *Hartwick,* 278 Mich. 139; *Goldberg* v. *Goldberg,* 295 Mich. 380. A wide latitude is allowed in the admission of testimony where the existence of fraud is an issue. *Taylor* v. *Ward,* 264 Mich. 118; *Daugherty* v. *Park,* 289 Mich. 561.

Appellant complains of errors in receiving testimony. The order in which testimony may be received in equity cases rests largely in the discretion of the court. There is no merit in the objection that the court received testimony concerning consideration or lack of it from defendant, called for cross-examination under the statute, at the beginning of taking testimony. Under our view of this case, testimony on the question of mental competence or undue influence does not control the result. *In re Balk's Estate,* 298 Mich. 303. We find no error in receiving testimony.

In *McGinn* v. *Tobey,* 62 Mich. 252 (4 Am. St. Rep. 848), bill was filed to set aside a deed and mortgage. Plaintiff entrusted some business to defendant and had implicit faith in his honesty and friendship. Defendant negotiated with plaintiff to lease plaintiff's store, defendant to draw the papers. Plaintiff was given a copy, which was read to him and which he read and signed. Plaintiff then signed what he believed to be a counterpart of the copy that he had signed previously. This latter paper turned out to be a deed. In holding that the deed passed no title, this court said (p. 260):

"The signature to this instrument is genuine, but the body of the deed is false, and the signing of complainant's name, without knowledge of such falsity, cannot cure it and make it a true and valid

instrument in the hands of any one. A genuine signature cannot change the character of an instrument of this kind, unless the intent to do so goes with the signature.''

In *Berry* v. *Whitney,* 40 Mich. 65, 72, this court said:

''There is also an abundance of authority that fraudulent representations as to the legal operation and effect of an instrument will be sufficient to avoid the same when made to a party who is able to read, or who has actually read the instrument, but who is unable to judge of its true character and construction. To have this effect the fraud must be contemporaneous with its execution, and must consist in obtaining the assent of the party defrauded, by inducing a false impression as to its legal or literal nature and operation. 2 White & Tudor's Equity Cases, part 1, 559–567 * and cases cited.''

In *Horvath* v. *National Mortgage Co.,* 238 Mich. 354 (56 A. L. R. 578), the facts were: Plaintiff and her husband were uneducated and ignorant of business. Defendant was an educated business man. Defendant persuaded plaintiff to let him manage her property, and she gave him a power of attorney. At the same time, defendant procured a warranty deed from plaintiff, which plaintiff claimed she did not sign, or, if her signature was genuine, it was procured by trickery. Later, defendant executed mortgages on the property. Plaintiff filed a bill to set aside the deed and mortgages. This court held:

''In view of this finding, the case before us is not one of so-called actual forgery, that is, where the signature to an instrument is simulated, but is one where a genuine signature is procured by fraud. Is the latter in law a forgery, and, if it is, does it

---

* 1851 edition, 71 Law Library.—REPORTER.

operate to defeat the rights of subsequent *bona fide* holders? On this question there is much conflict in the authorities. In many jurisdictions it is held that the procuring of a genuine signature to a deed by fraud does not constitute forgery. Our court has taken a different view, as an examination of the following cases will show: *Gibbs* v. *Linabury,* 22 Mich. 479 (7 Am. Rep. 675); *Anderson* v. *Walter,* 34 Mich. 113; *Crawford* v. *Hoeft,* 58 Mich. 1; *McGinn* v. *Tobey,* 62 Mich. 252 (4 Am. St. Rep. 848); *Beard* v. *Hill,* 131 Mich. 246.''

The condition of Mrs. Richardson's mind, weakened by disease, the apparent influence exercised over her by the defendant, the lack of probative value in defendant's testimony, the fact that the alleged conveyance was without consideration, and the admissible testimony of disinterested witnesses as to all the circumstances, is convincing that Mrs. Richardson did not intentionally execute a deed for the purpose of conveying her farm to the defendant. It was induced by the fraud and deceit of the defendant. Equity has inherent jurisdiction under these circumstances and may decree a cancellation of the alleged conveyance. *Gragg* v. *Maynard,* 164 Mich. 535. Under the circumstances of this case, equity will require a cancellation. Plaintiffs may take a decree in accordance herewith, with costs.

CHANDLER, C. J., and NORTH, STARR, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred. WIEST, J., did not sit.